SAGNER, ET AL. *v.* GLENANGUS FARMS, INC., ET AL.

[No. 222, September Term, 1963.]

*Decided March 11, 1964.*

*Motion to correct and modify opinion, or, in the alternative, for rehearing filed March 27, 1964, denied April 16, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Donald N. Rothman,* with whom were *Jacob Blum, Eugene M. Feinblatt,* and *Gordon, Feinblatt & Rothman* on the brief, for the appellants.

*William D. Macmillan* and *Lawrence Perin,* with whom were *William A. Fisher, Jr.,* and *Semmes, Bowen & Semmes* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

The case involves the construction and effect of an agreement in writing by which Stanley Sagner, owner of the thoroughbred stallion Saggy, undertook to cause to be sold to horsebreeders a number of indivisible shares of ownership in the horse in order to realize a large capital gain at a time when Saggy was enjoying preeminence as a sire. In the early summer of 1961, Sagner entered into negotiations with L. S. Mac-Phail, who was the principal owner of the corporation known as Glenangus Farms, Inc., which operated a stud farm in Harford County, in an effort to have MacPhail, who was experienced and knowledgeable in such matters, arrange for the syndication of the horse, as the sale of such shares is called. MacPhail finally agreed to participate and help in the syndication if Sagner agreed that Saggy would stand at Glenangus Farms for the breeding seasons of 1962, 1963, and 1964, and MacPhail would be syndicate manager and have complete charge of the breeding operations.

The syndicate agreement reached final form after a number of drafts in the latter part of August 1961, and beginning in the first part of September printed copies were mailed out to prospective subscribers. The agreement recited that it was between Sagner and "signers of counterparts hereof * * * hereinafter designated as the 'Shareholders,'" that Sagner was the owner of the thoroughbred stallion Saggy, "a syndicate having been formed for the purpose of purchasing a horse for the sum of One Hundred Sixty Thousand Dollars," and it was mutually agreed: a. that the ownership of Saggy was to be in thirty-two shares of $5,000 per share, and that each of the shares was on an equal basis with the others and indivisible; b. that Saggy should

stand at Glenangus Farms "under the sole personal management and supervision of L. S. MacPhail at the prevailing rates at Glenangus Farms for stallion keep; c. that MacPhail was to serve as manager of the syndicate, was to advertise the stallion, select the veterinarian, and establish the annual stud fee and terms and conditions of service; d. that the shareholders were to pay all charges, costs and expenses in the proportion that their respective shares bear to the whole number of issued shares; e. if the veterinarian in charge certified that it would be better that the stallion be bred to less than thirty-two mares, the owners of shares were to draw lots to determine whose mares were to be bred, and that if the veterinarian decided that the stallion could be bred to more than thirty-two mares, the proceeds of the additional seasons were to be divided equally among the shareholders; f. neither the syndicate manager nor Sagner were to be responsible for insuring the stallion but any shareholder could insure his own share for his own benefit.

It was then provided that every subscriber for one share was to pay its purchase price of $5,000 in three installments, the first $1,000 to be paid on or before February 1, 1962, a second payment of $2,000 on or before February 1, 1963, and the third payment of $2,000 on or before February 1, 1964. The purchase price was to be evidenced by a promissory note of the subscriber for a total of $5,000, payable to Sagner, with no interest if paid at maturity. It was then provided as follows: "Title to said shares shall pass unto the second party when the notes shall have been delivered as herein provided. In the event the syndication of the stallion be not completed, for any reason, prior to February 1, 1962, then the first party shall return to each subscriber the promissory negotiable note executed by said subscriber as aforesaid."

There followed the proviso that if Saggy died prior to February 1, 1962, any payments which had been made by any shareholder should be refunded and the notes for subsequent payments were to become null and void, and that if Saggy died after February 1, 1962, all notes due for payment after his death were to become null and void. It was then provided as follows: "This agreement may be executed in several counterparts, and when executed by all of the Shareholders and accepted by first

party, the several parts shall constitute the agreement between the parties as if all signatures were appended to one original instrument." MacPhail joined in the agreement in order to evidence his obligation to carry out his undertakings as expressed in the agreement.

Only four subscribers signed the agreement and gave notes as provided therein. Sagner was dissatisfied with the lack of success in selling shares in the horse, and in January 1962 notified MacPhail that as of February 1 he intended to cancel the syndication agreement. Towards the end of January, MacPhail, in his own behalf and for the benefit of those who had subscribed, filed suit against Sagner and one Gee M. Cohen, who had been Sagner's agent in negotiations as to the operation and meaning of the agreement, seeking a declaration as to the respective rights, duties and obligations of the parties, and an injunction restraining Sagner and Cohen from removing Saggy from Glenangus Farms, as they had said they intended to do.

In addition to the rights he claimed under the agreement, MacPhail relied on two independent oral substitute or complementary agreements. One allegedly provided that Saggy was to stand at stud in Glenangus Farms in 1962, 1963, and 1964 and that Sagner would pay $300.00 a month board and give to MacPhail one free service from Saggy during each of the three breeding seasons. The other oral agreement was said to have been that Sagner would give MacPhail either a one thirty-second interest in Saggy or $5,000 in cash in return for MacPhail's assistance in syndicating Saggy.

The four subscribers to the agreement later intervened as plaintiffs, as did two others who, although not subscribers to the syndicate agreement, had purchased a breeding service in 1962 to Saggy. The answer of Sagner and Cohen denied that Sagner had entered into any oral agreements and asserted that Sagner was the sole owner of Saggy because the syndication had not been completed by February 1, 1962, and that under the terms of the agreement was entitled to terminate the syndicate as he attempted to do. Sagner asked the court to declare that he was the sole owner of Saggy and entitled to possession of him.

After hearing testimony, Judge Cullen found the written agree-

ment to be valid and existing between the parties, disallowed the claim of MacPhail that Sagner had orally agreed to give him a thirty-second interest in Saggy or pay him $5,000 in cash, and found it unnecessary to pass on the alleged oral agreement that independent of the syndication agreement Saggy was to stand at Glenangus Farms. Sagner appealed from the decree which was entered in conformity with the opinion. There was no cross-appeal by MacPhail on the holding adverse to him.

MacPhail and Sagner each testified in support of his construction of the contract and offered witnesses and exhibits to substantiate his position. The testimony covered not only the details of the negotiations which led up to the making and form of the agreement but also the acts and declarations of the parties, and others involved, after its signing, and was directed not only towards showing the meaning of critical language in the agreement but also what the parties intended it to mean and thought it meant.

All of the testimony and the exhibits came in without objection as to admissibility. It is unnecessary to decide whether the evidence would have been admissible over objection because of any ambiguity in the agreement or for any other reason, such as, for example, its bearing on the meaning of technical terms, because there were no objections to its admission. *Montauk Corp. v. Seeds,* 215 Md. 491, 496; *Baltimore Luggage Co. v. Ligon,* 208 Md. 406, 413; and *Trust Co. v. Williams, Inc.,* 168 Md. 588, 597. Having come in without objection, the extrinsic evidence is to be considered, and allowed such force and effect as its weight entitles it in construing the agreement of the parties. *Chesapeake v. Goldberg,* 107 Md. 485, 489.

The record makes it clear that Sagner wished to capitalize on Saggy's long and excellent record as a sire and the fact that Saggy's offspring, Carry Back, recently had won the Kentucky Derby and the Preakness, so as to obtain as large a profit for the horse as possible as a capital gain, and that he decided as a result of conferences and discussions with those having knowledge and experience in the field, including MacPhail, that the best way to accomplish this result would be to syndicate the horse, as it is called, that is, to sell a number of indivisible shares to horsemen who would be interested in having their

mares bred to Saggy. It is also clear that the almost unvarying custom is for the owner of a horse which is thus syndicated to retain some shares for himself. It was shown that in 121 syndications, which apparently is all that have been undertaken in recent years, 119 of the owners had retained shares and in the two which the owner did not, the syndication had been unsuccessful because of the apparent lack of confidence of the owner in the stallion. Testimony on both sides was that Sagner was to retain anywhere from two to eight shares of Saggy himself and that this was understood by MacPhail and was in accord with the custom and usage in this field, and was to have been understood and expected by the horsemen likely to become subscribers to the syndication.

In his contention that the syndication became irrevocably binding and effective as soon as Sagner and one subscriber signed it, MacPhail relies heavily on the fact that in July of 1961 there was included in an advertising and promotional letter which MacPhail mailed out over Sagner's signature to those who might become interested in purchasing shares: "I have sold Saggy to a syndicate." It appears that these words were solely the idea of MacPhail and that Sagner did not see the letter until some time after it had been mailed out. However, when Sagner learned of the statement, he did not repudiate it because, he says, being completely inexperienced in syndications, he thought it was the way that prospective buyers customarily were made interested in subscribing. In any event, the statement was obviously inaccurate because the syndicate agreement had not even then been prepared, and could have meant no more than that Sagner had agreed to undertake to syndicate the horse. No subscriber said he relied on the statement, and MacPhail knew the facts.

Appellees make much of their claim that nowhere in the letter of July 1961 to prospective subscribers, in a release to the newspapers at a press conference called by MacPhail to announce the proposal to syndicate Saggy, in the brochure which thereafter went out again to prospective subscribers, or in so many words, in the syndication agreement itself, is there the statement that thirty-two shares must be sold if the syndicate is to be effective and operative. In support of the position that

there was no such condition, MacPhail testified that it was the custom, if the owner intended to reserve the right to declare the syndicate ineffective if less than all the shares were sold, for this fact to be stated in the "prospectus."

As has been pointed out the record leaves no doubt that it was the unvarying custom for the selling owner to retain some shares and not to require that all thirty-two shares be sold, and that this fact was within the knowledge of all those who were or might be interested in becoming subscribers. Further, Mac-Phail gave no example of any instance where such reservations had been put in a "prospectus" and he did not say or suggest what the "prospectus" would have consisted of in the case before us. The only example he gave of a reservation of a right to declare a syndicate inoperative if a certain number of shares were not sold was in the syndication of a horse named Hafiz, in which he had been personally involved, and there the arrangement was in a side agreement between the owner and MacPhail, which apparently had not been revealed to anyone else interested in the deal. In the present instance there is nothing in the record to show that either the fact of or the language of the Hafiz side agreement was made known to Sagner or those associated with him. The appellees also urge that Sagner, through his attorney, was the draftsman of the syndicate agreement; therefore, its language, if it is ambiguous, should be construed most strongly against him. The record does not show who drew the first draft of the agreement—there were five in all—but it does show that a syndication agreement of a horse named Hesiod, in which MacPhail was interested, was the model or prototype of the Saggy agreement, and that MacPhail had furnished the Hesiod agreement to Sagner, whose counsel had then made certain suggested changes, some of which were stricken out by MacPhail, who inserted his own revisions of some of the changes. The final draft of the Saggy agreement would seem to have been as much MacPhail's as Sagner's. It is clear that the language of the Hesiod agreement, as follows:

> "In the event the syndication of the stallion be not completed, for any reason, prior to February 1, 1959, then the first party shall return to each subscriber the

> promissory negotiable note executed by said subscriber
> as aforesaid,"

was copied verbatim into the Saggy agreement (except that
the date was changed to February 1, 1962).

The appellees urge strongly that the provision in the syndi-
cate agreement that "[t]itle to said shares shall pass unto the
second party when the notes shall have been delivered as here-
in provided," negates any possible inference that the language
as to the noncompletion of the syndication by February 1, 1962,
which follows immediately, could mean that Sagner had any
right to call off the syndicate if sufficient shares were not sold.
The evidence was that the Hesiod agreement contained lan-
guage just before the February 1 language, as follows: "Title
to said shares shall remain in the first party until the full pur-
chase price therefor has been remitted," and that the change
as to passage of title had been made by Sagner's lawyer at the
suggestion of his tax adviser, who felt that Sagner's goal of
realizing a capital gain at the right time would be made certain
by the language used.

In his turn Sagner relies on various declarations and acts
to support his construction of the agreement. First, in a letter
of August 31, 1961, before the syndicate agreement had been
mailed out to prospective subscribers and before any litigation
was even in prospect, he had written MacPhail as follows:

> "I certainly am not looking for any problems for the
> completion of the Syndication—especially with the lib-
> eral terms that we have presented to the prospective
> buyers of the 32 shares. I feel that it would be a re-
> flection on both your prestige and mine if the Syndi-
> cation is not 100% prescribed." [sic]

MacPhail did not repudiate Sagner's expressed understanding
of the agreement and, on the contrary, assured him on a num-
ber of occasions that he had until February 1, 1962, to with-
draw and that he could do so unless the syndicate became fully
subscribed. One of these occasions was on October 22, 1961,
when MacPhail admitted to Sagner that prospective buyers
were not responding to his sales effort, and Sagner replied that

although he had until February 1, 1962, to cancel the agreement, it might be better for all parties if he cancelled out before that time. MacPhail told Sagner that he could call off the syndicate immediately as far as he, MacPhail, was concerned and several days later, by letter dated October 24, Sagner wrote MacPhail that although he had until February 1, 1962, to make a decision he was exercising his prerogative to call off the syndication immediately. (It was agreed at the argument, as we think it must have been, that Sagner had no such right at that time and that he had misconstrued the terms of the contract.)

Some ten days before the letter of October 24, MacPhail, knowing that subscriptions to shares in Saggy already had been received, mailed Sagner a bill for Saggy's board at Glenangus Farms with the following legend: "The amount of this bill will be charged to the syndicate if and when established."

Sagner points to the additional fact that after the letter of October 24, his lawyers and MacPhail's lawyers had arranged for future negotiations and dealings to be carried out by Sagner's agent, Gee Cohen, and MacPhail, and that under no circumstances was MacPhail to deal directly with Sagner (the record makes it clear that almost from the start Sagner and MacPhail did not think alike or see eye to eye, that their personalities were clashingly incompatible) and that on November 10 MacPhail assured Cohen that he, MacPhail, would have no trouble in selling at least twenty more shares in Saggy, to which Cohen replied that twenty would not be enough because Sagner only had two or three mares and would not be willing to keep more than four or five shares for himself. On the next day, November 11, there was published in the Bloodhorse Magazine an advertisement of Saggy as a stud horse, in which MacPhail had caused to be inserted the statement that Saggy was the property of Stanley Sagner. This was in distinction to the previous advertisements in that magazine on October 21 and on August 12, which stated, again at the direct instance of MacPhail, that Saggy was the property of a syndicate. Sagner says it is significant that on October 21, 1961, MacPhail had not yet had his conversation with Sagner in which the latter threatened to call off the syndication and MacPhail had told him to go ahead, and that the advertisement of November 11, which

stated that Saggy was the property of Sagner, appeared some three weeks thereafter.

The trial court decided the case on the basis of the language as to the passage of title to shares at the delivery of the notes, finding that this was not the first time that a reputable and successful business man had sought a tax advantage to which he was legally entitled "only to find later that the language used jeopardized his rights in other respects, or at least made them uncertain." In so doing, the court, erroneously we think, gave no effect to the language which follows immediately in the agreement, that if the syndicate is not completed for any reason before February 1, 1962, the notes shall be returned by Sagner.

We see no inconsistency or impossibility of reconciliation between the fact that title was to pass to the shares upon delivery of the notes in order to accomplish Sagner's tax plans and purposes and the provision immediately following, which gave Sagner the option to cancel the agreement if his attempt to sell Saggy for up to $160,000—and so make the tax accomplishment significant—was not successful.

A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed. We can find no sound reason to read the completion clause out of the contract. *Kimmel, Tr. v. W. T. Grant Co.,* 233 Md. 466, 469; *Lumber Co. v. Bldg. & Savings Assn.,* 176 Md. 403; *Hart v. Hart,* 165 Md. 77, 80; *Waters v. Griffith,* 2 Md. 326, 333; 17A C. J. S. *Contracts* Sec. 309, pp. 163-164. We think a reasonable person in the position of the parties would have thought the completion provision and the contract as a whole meant what Sagner says it meant and, therefore, that construction is the true meaning of the agreement. *Ray v. Eurice,* 201 Md. 115, 127.

In property law a title which is subject to be divested has long been recognized and, by analogy, in contract law there often may be contract rights which are subject to a condition

168

subsequent. 5 *Williston, Contracts* (3rd Ed.), Secs. 666, 667; 3A *Corbin, Contracts,* Ch. 39. Title to the shares was such a right, in our opinion, under the wording of the agreement.

We think that this reading of the contract before us certainly is not refuted, and indeed may well be supported by the parol or extrinsic evidence to which we have referred.

The appellees urge that the language as to Sagner's rights if the syndicate was not completed by February 1, 1962, was meant only to protect the shareholders against some misfortune happening to Saggy which would prevent the fulfillment of the purposes of the subscribers to the syndicate. This interpretation was first suggested by MacPhail in his rebuttal testimony. We cannot accept his suggestion of the meaning of the clause, in light of the fact that MacPhail himself said that it was put in the Hesiod agreement because Hesiod was a young, untested stallion, whereas it was known to MacPhail (and also to the prospective subscribers) that Saggy was a strong, virile stallion of proven high potency over a long period. Furthermore, Sagner had insisted on adding to the language of the Hesiod draft the clauses protecting the subscribers if Saggy should die either before or after February 1, 1962 (which were not in the Hesiod agreement), so that the need for protecting the subscribers to Saggy, as MacPhail claims was to be provided by the completion clause, was taken care of by facts and provisions which made that clause unnecessary for that purpose.

Appellees urge finally that the completion clause cannot be read to mean what it literally says because this would be unfair or inequitable in that Sagner could call off the syndicate if thirty-one and not thirty-two shares were sold. The argument to the contrary can be made—and is by Sagner—that it would be unfair and inequitable to Sagner to require him to sell but four thirty-seconds of his horse and retain twenty-eight, when he desired to retain only four or five shares, as was customary for a syndicating owner to do. As we have said, it was understood by the appellees that the syndicate would be considered complete only if twenty-seven (or, at least, twenty-four shares) were subscribed to, and as the matter wound up, only four were.

The appellees make two additional contentions: first, that Sagner, by not returning the promissory notes executed by the subscribers, waived the right, if any he had, to assert that the syndication had not been completed by February 1, 1962. We think the contention is not valid. When MacPhail forwarded to Sagner the notes which the subscribers had signed and delivered to MacPhail, Sagner's counsel immediately informed counsel for the appellees and MacPhail that the notes would be returned to the makers if on February 1, 1962, all of the shares being offered for sale had not been sold. Thereupon, appellees' lawyers took the position that since the notes had been delivered, the subscribers already had title to four shares of the Saggy syndicate and that Sagner could not declare the syndicate inoperative. On January 27, 1962, before the date the notes were to be returned, suit was filed to enforce the rights claimed by the appellees. Sagner testified that he was holding the notes in escrow, pending the outcome of the litigation. It would have been futile for him to return the notes in view of the appellees' position that they were not entitled to receive them because they were subscribers to the syndicate and the law will not require one to do a futile act. *Lissau v. Smith,* 215 Md. 538, 545. Nothing that Sagner did or failed to do in this aspect of the case was inconsistent with his stand that he had the right to cancel the contract.

The second subsidiary contention of the appellees is that Sagner was estopped to cancel the syndicate. The short answer to this is that there is nothing in the record to show that MacPhail or any subscriber actually relied on Sagner's words or conduct to their detriment, except to the extent that they relied on the words of the syndicate agreement which they signed. The appellees' argument of estoppel necessarily presupposes, for the argument at least, that Sagner had the right to cancel if the syndicate was not formed by February 1, 1962. Therefore, they must have shown, to be successful on the point of estoppel, that Sagner induced them to believe that he would not cancel the syndicate if it was not completed, and he did not.

Perhaps if the appellees had shown that they had relied on Sagner's statement or known intention that he would or intended to retain from four to eight shares for himself, a case of

estoppel could have been made out if there had been sold twenty-four shares (or more if Sagner decided to keep fewer shares) of the total number of thirty-two, but only four shares were sold and no appellee claims he acted in the belief that Sagner would retain more than eight shares.

No detriment to the subscribers has been shown and no detriment to MacPhail has been claimed. (The record reveals that the mare of each of the appellees other than MacPhail was bred to Saggy during the 1962 season.)

We think that the record compels the conclusion that there was no waiver by Sagner of his right to cancel the syndication, that he is not estopped to do so, and that MacPhail's claim that independent of the syndicate agreement there was an oral agreement that Saggy was to stand at Glenangus Farms and that board was to be paid by Sagner at the rate of $300.00 a month must fail.

*Decree reversed, with costs.*