MacPHAIL ET AL. *v.* SAGNER ET AL.

[No. 247, September Term, 1971.]

*Decided July 6, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SMITH and DIGGES, JJ., and KENNETH C. PROCTOR, Associate Judge of the Third Judicial Circuit, specially assigned.

*Douglas G. Worrall,* with whom were *William B. Somerville* and *Smith, Somerville & Case* on the brief, for appellants.

*John Carroll Byrnes* and *Donald N. Rothman,* with whom were *Charles Yumkas* and *Gordon, Feinblatt & Rothman* on the brief, for appellees.

PROCTOR, J., delivered the opinion of the Court.

On October 27, 1969, in an interim opinion, Judge

Solomon Liss expressed the fond hope that this proceeding was then "in its last furlong." Although that segment of this endurance contest was not the last furlong, this is.

On July 19, 1961, the famous Maryland bred stallion Saggy, owned by the late Stanley Sagner (Sagner),[1] was moved from the Country Life Farm of Joseph Pons to Glenangus Farms, Inc. (Glenangus), owned by Larry S. MacPhail (MacPhail), (Glenangus and MacPhail being herein collectively referred to as appellants). The transfer was pursuant to a proposed syndication agreement, negotiations for which had begun a month or two earlier. Saggy's value as a studhorse had increased substantially in the summer of 1960 when one of his get, Carry Back, won both the Kentucky Derby and the Preakness. Sagner desired the syndication for tax purposes—MacPhail because it gave standing to his horse farm.

The syndicate agreement, after a number of drafts, reached final form in the latter part of August, 1961. Its pertinent provisions were: (1) Purchase price—$160,-000; (2) Shares to be sold—thirty-two at $5,000; (3) Purchase price of each share to be evidenced by a negotiable promissory note payable to Sagner, $1,000 to be paid on or before February 1, 1962, $2,000, on or before February 1, 1963, and $2,000, on or before February 1, 1964; (4) Saggy to be kept at Glenangus during the 1962, 1963 and 1964 breeding seasons under the personal management of MacPhail; (5) MacPhail to manage the syndicate, and (6) Rights of shareholders were detailed and breeding conditions were specified. Finally it was agreed that "In the event the syndication of the stallion be not completed, for any reason, prior to February 1, 1962,

---

1. In reply to a request for admission of fact (filed on May 13, 1970), Sagner admitted that Saggy was the property of a partnership "consisting of Stanley Sagner and Helen L. Sagner, his wife, trading under the style of Saggy Farms." However, although suit was filed in the name of Sagner alone on June 2, 1964, MacPhail and Glenangus first questioned the lack of proper parties plaintiff, less than a month before trial, by motion for summary judgment filed on May 18, 1970. That Sagner must be considered the proper party plaintiff is hereinafter discussed.

then the first party (Sagner) shall return to each subscriber the promissory negotiable note executed by said subscriber as aforesaid." MacPhail joined in the agreement to bind him to carry out his obligations thereunder. In a prior appeal, *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 164, 198 A. 2d 277 (1964), this Court found that "The final draft of the Saggy agreement would seem to have been as much MacPhail's as Sagner's."

By September 19, 1961, only five shares had been subscribed. On October 24, 1961, having become disenchanted with MacPhail's efforts to promote the syndicate, Sagner made an abortive effort to cancel the agreement. One of the subscribers withdrew at that time. Correspondence between counsel for the parties ensued. On December 4, 1961, Sagner's attorney wrote MacPhail's attorney that:

> "If there is a failure of such sale (i.e. of shares), the contract is void, and we are entitled to return of the horse on February 2, 1962 upon paying to Mr. MacPhail all legitimate expenses to which he has been subjected and for which we would normally be liable. We intend to live up to the literal terms of the language of the agreement with respect to returning to prospective purchasers any notes which are in our possession, if on February 1, 1962, all 32 shares are not sold. In the event that Mr. MacPhail refuses to turn over to us the horse upon payment of his legitimate claims for expenses, we shall hold him strictly accountable for the value of the horse plus all losses of earnings which we have reason to expect for the breeding seasons in which Mr. MacPhail would continue to deprive us of our rights of ownership."

No additional shares were sold. On January 27, 1962, MacPhail filed declaratory judgment proceedings against Sagner and refused to return Saggy. That proceeding was decided in favor of MacPhail on May 22, 1963. That judgment was reversed by this Court on March 11, 1964.

A motion to modify the opinion or for a rehearing was denied on April 16, 1964. Thereafter MacPhail persisted in his refusal to return Saggy, for the first time claiming an agistor's lien. On June 2, 1964, this replevin proceeding was instituted by Sagner against MacPhail and Glenangus. A replevin bond was filed by Sagner and Saggy was finally returned to the Country Life Farm on June 3, 1964.

MacPhail filed pleas and a counterclaim, alleging that Sagner's "wrongful action and conduct" had caused "this Defendant to suffer great loss and damage." Glenangus filed pleas and three counterclaims. The first was based on an alleged agreement by Sagner to pay for board and other expenses at the rate of $300 per month from July 19, 1961, to June 3, 1964, or a total of $9,562.15. The second alleged an understanding between it and Sagner under which he was to pay the reasonable cost of board and other expenses which was $300 per month for the period from July 19, 1961, to June 3, 1964. The third was for damages attributable to Sagner's alleged delay in the preparation of the Syndication Agreement and his alleged premature attempts to cancel the agreement.

Glenangus filed a motion for summary judgment on the issue that it was entitled to reimbursement for board and other expenses for the period from July 19, 1961, to April 16, 1964 (first and second counterclaims). On June 13, 1969, Judge David Ross entered judgment on that motion on the issue of liability alone in favor of Glenangus, for the reasonable cost of board, keep and maintenance of Saggy for the period September 1, 1961, through January 31, 1962, and in favor of Sagner on the claim for such costs for all periods subsequent to January 31, 1962.

Sagner filed motions for summary judgments (1) on the replevin suit for the stallion Saggy and for damages caused by his detention; and (2) on MacPhail's counterclaim and the third counterclaim of Glenangus. On July 10, 1969, Judge David Ross entered judgment on the motion in favor of Sagner "with respect to the replevin ac-

tion as to liability only, leaving for determination by the jury the amount of damages, if any." On February 20, 1970, Judge Solomon Liss dismissed the counterclaim of MacPhail and the third counterclaim of Glenangus "with prejudice". By that order Judge Liss also ruled,

> "That the Plaintiffs are entitled, subject to proof, to the reasonable value of the stud fees lost by the Plaintiffs by reason of the detention of Saggy from February 1, 1962, including any stud fees received by MacPhail and Glenangus Farms while the horse was in their possession against which fees must be charged a reasonable management fee, as determined by the custom of the trade, but not the cost of board and maintenance incurred by MacPhail and Glenangus, together with other damages properly recoverable in a replevin action, including the costs of this suit."

Appellants moved for summary judgment in their favor on Sagner's claim for damages, apart from costs, bond and punitive damages in favor of Sagner, for one cent nominal damages. The basis for this motion was the contention that Saggy was in fact owned by a partnership. On June 1, 1970, this motion was denied by Judge Shirley B. Jones.

The case was tried on the question of damages before a jury, Judge Jones presiding, between June 11 and 18, 1970. The jury returned a verdict in favor of Sagner in the amount of $131,000. On May 10, 1971, Judge Jones entered judgment absolute in favor of Sagner in the amount of $165,508.02, setting forth in a memorandum opinion the basis for such judgment.

Appellants allege that the trial court erred in certain determinations hereafter discussed.

I. *Measure of Damages—Based on Saggy's Return on February 1, 1962.*

Appellants contend that the measure of damages de-

lineated in the order of Judge Liss of February 20, 1970, and incorporated, in substance, in Judge Jones' charge to the jury was erroneous. They further contend that Sagner's damages should have been measured according to the rules of restitution.

These contentions are, at least in part, based upon the subsidiary assertion that in replevin actions the right to possession and entitlement to damages are distinct remedies. As authority for this proposition appellants cite *Koch, et al. v. Mack International Motor Truck Corp.,* 201 Md. 562, 572, 95 A. 2d 105, 110 (1953) and *Burnett v. Bealmear,* 79 Md. 36, 40, 28 A. 898, 899 (1894). It is to be noted that in each of these cases the property sought to be replevied had already been returned to the party entitled to possession. In *Burnett v. Bealmear, supra,* this Court said:

> "As the property had been delivered to the plaintiff, it would have been an error to give him a verdict for its appraised value, * * *. The proper verdict for the plaintiff, when he is entitled to it, is merely for damages for the detention of the goods. This may be seen by examining the approved precedents. 1 Evans' Harris 508. It is said in *Hoskins v. Robins,* 2 Wms. Saund. 320, note 1: 'The plaintiff obtained a verdict, and he is only entitled to damages for the wrongful taking and costs, but not to the value of the goods taken, as he is in trespass, for they were delivered to him when replevied.' "

To the same effect is *Koch et al. v. Mack International Motor Truck Corp., supra.*

Maryland Rule BQ44 a provides that "When filed with the bond, the declaration shall allege that the defendant unjustly detains the property, and shall claim the return of said property plus damages for its detention."

The only reasonable inference to be drawn from these decisions and from the Maryland Rule is that the plaintiff

in a replevin action is entitled to damages for the detention of the goods for which replevin is sought.

This rule is supported by other authorities. 46 Am. Jur. *Replevin,* sec. 142:

> "The rule is well settled that where property has a value on account of the use to which it may be put, as distinguished from its value for sale or consumption, the successful party is entitled to recover as damages for its detention the value of such use during the time that the property was wrongfully detained. Thus, where the property detained consists of horses, tools, implements of trade etc., the general rule is that the party deprived of possession is entitled to the reasonable. value of the use during the period of wrongful detention." [See also—79 A.L.R.2d 733; *Drinkhouse v. VanNess,* 260 P. 869 (Cal., 1927), which involved replevin of a stud horse.]

The theory that Sagner is entitled merely to restitution and not to damages for detention is based upon the faulty premise that appellants retained possession first as stakeholders and, after February 1, 1962, under a judgment or decree of court.

Appellants asserted that restitution was the correct measure of damages in one of the preliminary arguments before Judge Liss, who ruled against them. However, they did not request that Judge Jones charge the jury on this theory. The contention that they were stakeholders from February 1, 1962, until May 22, 1963, was made for the first time in their brief in this case. They were not stakeholders. At most they were bailees, and the bailment was terminated on February 1, 1962. *Sagner v. Glenangus Farms, Inc., supra.*

Although, in their bill for declaratory judgment, they requested a temporary order enjoining Sagner from removing the horse, this relief was never pursued and no such order was ever signed. Thus between February 1, 1962, and May 22, 1963, the date on which Judge James

Cullen signed the decree in the declaratory judgment case, no judgment, decree or order of any kind had been issued in the declaratory judgment proceedings, let alone a judgment, decree or order which required or authorized appellants to retain possession of Saggy. By Judge Cullen's decree neither appellant was required or specifically authorized to retain possession of the stallion. That decree merely held that the syndication agreement was a valid and subsisting agreement between the parties; that the clause, which this Court on appeal held gave Sagner the right to cancel such agreement, did not mean that all thirty-two shares had to be subscribed for and purchased by persons other than Sagner prior to February 1, 1962; and that all other terms and provisions of such agreement were valid and binding upon the parties.

In the cases cited by appellants to support their contention that Sagner's recovery of damages should be limited by the rules of restitution, the act of the person asked to respond in damages dated from and was based upon a judgment by a court of competent jurisdiction. For example, in *Johnson v. Robertson*, 34 Md. 165, 172-3 (1871), it was noted that whatever had been done by the defendant had been done "under and in strict execution of the decree appealed from", which was a decree of sale in a mortgage foreclosure proceeding. Likewise, in *Redwood Hotel, Inc. v. Korbien*, 197 Md. 514, 80 A. 2d 28 (1951), restitution was requested by petition filed in the equity case in which the petitioner had surrendered a hotel pursuant to a permanent injunction, which was later vacated.

Finally, the distinction between a tort action for damages and a quasi-contractual action for restitution is stated by *Prosser, Law of Torts*, sec. 94, pp. 644-5 (3rd ed. 1964), to be as follows:

> "The ordinary delictual action for a tort usually is not concerned with restitution, since it seeks to compensate the injured person for his loss, irrespective of the receipt of anything

by the defendant. *Even those tort actions which demand the return of specific property, such as replevin or ejectment, are in theory, at least, seeking to restore the plaintiff to his prior position, although they may often have the incidental effect of giving him the benefit of the increased value of the property.* Restitution in quasi-contract, on the other hand, looks to what the defendant has received which in good conscience should belong to the plaintiff; and this may be either more or less than the amount of the plaintiff's actual loss." (Emphasis supplied).

The trial court applied the correct measure of damages; retention of possession of Saggy by Appellants on and after February 1, 1962, was illegal and was not made lawful by Judge Cullen's decree. By electing to retain possession of the stallion after the date of such decree they gambled that Judge Cullen's decision was correct, and, with the reversal by this Court, they lost their bet.

II. *Mitigation of Damages — Properly Limited to Events After February 1, 1962.*

Appellants contend that the trial judge erred in limiting (by paragraph III of the Pre-Trial Order of June 9, 1970) their right to introduce evidence in mitigation of Sagner's damages to his actions or inaction after February 1, 1962. The rights and duties of the parties prior to that date were resolved by this Court in *Sagner v. Glenangus Farms, Inc., supra.* Appellees there contended that Sagner was estopped from asserting his right, if any, to cancel the syndication agreement by virtue of his actions and inaction prior to February 1, 1962. We did not agree.

In addition, the rule adopted by Judge Jones is supported by 79 A.L.R.2d 725, (1961) "Livestock—Loss or Injury—Damages" § 14, "Duty to reduce damages" (an authority relied on by appellants in their brief) :

"The general rule that *one who is injured by the wrongful act of another* is bound to exercise

reasonable care to avoid loss or to minimize the resulting damage, and, to the extent that his damages are the result of his active enhancement thereof, or are due to his failure to exercise such care, he cannot recover, has been applied in cases involving actions for the loss, injury or destruction of livestock." (Emphasis supplied).

The "wrongful act of another"—the refusal by appellants to return Saggy to Sagner—did not occur until February 1, 1962. In arguing this point they also rely on *Hoff v. Lester,* 25 Wash. 2d 86, 168 P. 2d 409 (1946), a replevin action in which defendant was permitted to mitigate plaintiff's damages by evidence that he failed to avail himself of his right to obtain possession of his property by filing a bond. Under Judge Jones' ruling such proof could have been offered in this case. Under her charge—which included a correct statement of the law on mitigation—this point could have been argued.

We find no error in the trial court's rulings on this question.

III. *Sagner Not Estopped From Claiming That Saggy's Reasonable Foal Fee At Any Time After February 1, 1962, Could Have Been Other Than $2,-500.*

The Pre-Trial Order of June 9, 1970, signed by Judge Jones provided:

"I. The Plaintiffs may introduce evidence to the jury subject to the usual rules of relevancy and materiality of the following items of damage:

1. The stud fees lost, if any, by the Saggy Farms Partnership from and after February 1, 1962, as a result of the detention of Saggy by Defendant.

(a) In this connection Plaintiff is not estopped to claim that Saggy's reasonable stud

fee at any time after February 1, 1962 would have been other than $2,500.00.

\* \* \*

"III. Defendants may introduce evidence to the jury, subject to the usual rules of relevancy and materiality, of the specific amount which Plaintiffs' damages, if any, would have been mitigated but for Stanley Sagner's action or inaction after February 1, 1962."

The charge to the jury, in part, read as follows:

"\* \* \* the second item of damage claimed is the loss of stud fees sustained by the Saggy Farm Partnership for the three breeding seasons of 1962, 1963, and 1964.

"In determining the loss of stud fees, if any you find, during the three breeding seasons, you are instructed that the measure of this loss is the number of live foal, not for example the number of the book or number of covers, but the number of live foal which the jury may find from the evidence were not realized or produced during this period, times the amount of such stud fee which the jury finds it would be reasonable to charge had the stallion Saggy not been detained by the defendants at Glenangus Farms during these three seasons. So basically, the number of live foal times the reasonable stud fee would have been charged had Saggy not been detained at Glenangus Farms during the three seasons involved.

"Now in making these determinations you are to consider all of the facts and circumstances as you find to have existed during this period of time. The facts and circumstances, of course, are the subjects of controversy and were brought out in the testimony. It is entirely up to you to determine and resolve the issues, and determine just what the facts and circumstances were during these three seasons."

Appellants did not request that Judge Jones include in the charge their theory of estoppel.

Thus both the Pre-Trial Order and the charge to the jury left the question of what would have been a fair foal fee for Saggy's services open to proof and argument by both sides. The charge properly left the determination of the answer to that question to the jury.

Appellants contend that "Sagner should now be estopped to measure the book on any fee other than $2,-500", first, because the fee for the 1962 breeding season was established at $2,500; and, second, because, in an answer (filed June 19, 1969) to an interrogatory, Sagner stated that "Plaintiffs maintain that Saggy's live foal fee during the years 1962, 1963 and 1964 would have averaged $2,000.00 had Saggy been returned to Stanley Sagner for those breeding seasons."

The question of equitable estoppel was discussed at length and in depth in *Crane Co. v. Onley,* 194 Md. 43, 49-50, 69 A. 2d 903, 906 (1949). This Court there said:

> "In the case of *Benson v. Borden,* 174 Md. 202, 198 A. 419, Judge Mitchell discusses the difference between waiver and estoppel, often used synonymously. He quotes at pages 219 and 220 of 174 Md., at page 427 of 198 A. from 40 Cyc. 255: 'While waiver belongs to the family of estoppel, and the doctrine of estoppel lies at the foundation of the law of waiver, they are nevertheless distinguishable terms. * * * Waiver is the voluntary surrender of a right; *estoppel is the inhibition to assert it from the mischief that has followed.* Waiver involves both knowledge and intention; *estoppel may arise where there is no intent to mislead.* Waiver depends upon what one himself intends to do; *estoppel depends rather upon what he causes his adversary to do.* Waiver involves the acts and conduct of only one of the parties; *estoppel involves the conduct of both. A waiver does not necessarily imply that one has been misled to his prejudice*

> *or into an altered position; an estoppel always involves this element.* \* \* \* Estoppel may carry the implication of fraud, waiver does not. A waiver may be created by acts, conduct or declarations insufficient to create a technical estoppel.'" (Emphasis supplied.)

See also: *Savonis v. Burke*, 241 Md. 316, 319-320, 216 A. 2d 521, 523 (1966); *Johnson Lumber Co. v. Magruder*, 218 Md. 440, 445-446, 147 A. 2d 208, 211 (1958); *Fitch v. Double "U" Sales Corp.*, 212 Md. 324, 337-339, 129 A. 2d 93, 100 (1957).

The mere recital of the elements of estoppel demonstrates that it is not applicable here.

There could have been no reliance of appellants on the statement in the answer to an interrogatory, above quoted, for the reason that at the time it was made this litigation had then been pending for five years. The answer could, of course, have been offered in evidence by appellants but could not be asserted against Sagner as a basis for estoppel.

Regarding the fee of $2,500 established for the 1962 breeding season, even though MacPhail testified that he told Sagner this was too high, it had been negotiated by the parties. In their brief appellants state: "Sagner made an unequivocal demand that Saggy stand at *no less than* $2,500." (Emphasis supplied). This was the least amount Sagner was willing to accept—not necessarily the maximum the market would pay. At the trial Snowden Carter, an expert witness for Sagner, expressed the opinion that Saggy "would have been able to stand for $2,500 fees, and had a full book at Country Life Farm". Gee Cohen, another expert for Sagner, testified that, in his opinion, in 1962 and 1963 Saggy could have demanded a foal fee of $5,000, and in 1964 somewhere between $3,500 and $6,000.

Finally, we can find nothing in the record to support the contention that MacPhail, and through him Glenangus, "was misled to his prejudice or into an altered posi-

tion", or took any action based upon the established foal fee of $2,500 for the 1962 breeding season. On the contrary, throughout this extended litigation MacPhail has contended that he was not liable for any loss of foal fees —no matter what the fee was.

We hold that Sagner was not estopped to claim that Saggy's reasonable foal fee at any time after February 1, 1972, would have been other than $2,500.

IV. *Sagner Entitled to Recover Damages Suffered by the Partnership.*

Appellants contend that Sagner was entitled to recover only the bond premium; that as Saggy was owned by a partnership consisting of Sagner and his wife trading under the style of Saggy Farms, Note 1, *supra,* he was not entitled as sole plaintiff to recover damages for the loss of use of the stallion. As has been noted, this action was filed on June 2, 1964, and Sagner's right to sue in his name alone was questioned for the first time on May 18, 1970.

Maryland Rule 323 a provides: "The following defenses may at the option of the pleader be made by motion: * * * (8) want of necessary parties." Section c of that Rule provides: "*A motion raising one or more such defenses, * * * shall be filed before any other pleading on behalf of the party making the motion is filed * * *.*" (Emphasis supplied). This Rule merely enunciates what had previously been the law in this State. In *Anderson v. Stewart,* 108 Md. 340, 349, 351, 70 A. 228, 231, 232 (1908), a replevin action, a directed verdict had been rendered in favor of the defendant on the ground that there was a variance between the proffered proof (that the party entitled to possession was a partnership) and the declaration (that such party was an individual). This Court held (at 351):

> "But even if there were held to be a variance in this case, it would upon the authority of *Brown v. Ravenscroft,* 88 Md. 216, be waived

by failing to plead in abatement, and pleading over to the merits. In that case we adopted the reasoning and results of the decision in *Wright v. Bennett*, 3 Barb. 451, where it was said, 'The plaintiff, as one of the joint owners of the property, is entitled to the possession as against a stranger, *in which position the defendant stands, as he does not connect himself with the title of the other owners, who have been omitted,* as plaintiffs, and there is great propriety in holding him to his plea in abatement, if he desires to avail himself of that omission, and the bare fact that the plaintiff with others, and not alone, owns the property, is no bar, either under the plea of *non detinet* or when specially pleaded, though it would be proper matter for plea in abatement.' " (Emphasis in original.)

This Court further held (at 108 Md. 349) :

"The possession of one partner is the possession of all; and it is this principle which forbids that one partner or tenant in common, should maintain replevin against another. Where a single partner recovers in replevin firm property *from a third person,* his recovery is in right of the firm, and is the recovery of the firm. His possession before the wrongful taking was the possession of the firm, and his possession, after recovery and delivery of the property, is still the possession of the firm. The title is never put in issue at any time and is in no manner affected in such case." (Emphasis in original.)

Accordingly, appellants waived their right to question Sagner's entitlement to possession and damages by failing to present the question by an appropriate and timely motion under Rule 323.

### V. *Glenangus Not Entitled to Board And Keep After February 1, 1962.*

Glenangus contends that Judge Ross erred in the order of June 13, 1969, in which he denied its claim for board and keep as to all periods subsequent to January 31, 1962. It there argued that such claim should be allowed either on the basis of an agistor's lien or under principles of restitution. It contends in this appeal that such claim should be allowed either because this was a benefit received by Sagner, the value of which benefit should be applied in reduction of Sagner's "gross" damages, or that "the adjusting of the equities between Glenangus and Sagner" requires its allowance.

Judge Jones in her memorandum opinion of May 10, 1971, allowed credits to MacPhail (Glenangus being his *alter ego*) for a reasonable fee for management of Saggy for the 1962, 1963 and 1964 breeding seasons of $6,000 plus interest thereon of $2,499.29, and to Glenangus its management expenses for the period from February 1, 1962, to June 3, 1964, in the amount of $1,709.94 plus interest thereon of $712.30; also MacPhail was allowed credit for full board and keep up to February 1, 1962, in the amount of $1,546 with interest thereon of $860.35.

Board and keep were furnished over Sagner's loud and continued protest that he wanted possession of Saggy —not board and keep for him at Glenangus Farms. Mac-Phail, by not heeding this protest, had the stallion available for servicing his mares for three breeding seasons, and Judge Jones made no allowance to Sagner for this.

Appellants rely on *Rowan v. State, use of Grove*, 172 Md. 190, 200, 191 A. 244, 249 (1937). Rowan had replevied a race horse, sold it and then allowed a judgment of *non pros.* to be entered against him. Grove had previously purchased the horse at a sheriff's sale. Grove sued on the replevin bond. Rowan defended claiming title to the horse and credit for purses collected by Grove while the horse was in his possession. This Court held that Grove had acquired possession from the sheriff in an

orderly proceeding; that, if Rowan could prove, on a new trial, that the horse was owned by him while in Grove's possession, Rowan could recover purses collected by Grove subject to deduction for expenses incurred by Grove in caring for the horse. This ruling, however, was because Grove had acquired possession lawfully.

Appellees further rely on the note found in 7 A.L.R.2d 933. However, at p. 936 the note reads:

> "In conformance with the general rule, *in computing damages for the wrongful use or detention of animals, all proper allowances* for the cost of keeping, feeding and caring *for such animals should be allowed to the party who possesses them under claim of right.*" (Emphasis supplied.)

As noted above, appellants' possession after February 1, 1962, was unlawful.

The case of *Forsee v. Zenner*, 193 S. W. 975, 979 (Mo. 1917), did hold an instruction that loss of use damages were subject to a credit for "all proper allowances for cost of keeping" a team of mules. However, this instruction was granted at the request of the successful litigant, who was in the same position as Sagner. The case of *Drinkhouse v. VanNess*, 260 P. 869 (Cal., 1927), did not deal with this subject. *Haggerty Bros. v. Lash & Shaughnessy*, 87 P. 907, 908 (Mont., 1906), did hold that the defendant was entitled to gross damages less expenses of feeding and caring for horses. However, plaintiff, although the ultimate loser, had come into possession of horses and wagons lawfully as defendant had defaulted under an installment contract.

We adopt Judge Ross' opinion of March 27, 1969, on the claim as an agistor's lien and denying reimbursement on principles of restitution:

> "* * * Glenangus waived whatever claim to an agistor's lien it might have had when it based its claim to the right of continued possession

of Saggy on the syndication agreement and the alleged separate agreement for Saggy to stand at Glenangus during the 1962, 1963 and 1964 seasons at $300 per month in the prior action to which it was a party. A lien on goods is deemed waived and extinguished if the right to possession is claimed on a ground other than the lien. 33 Am. Jur. *Liens,* sec. 28; *Folsom v. Barrett,* 180 Mass. 439, 62 N. E. 723; 16 English Ruling Cases 144. Furthermore, the letter of December 4 mentioned above constitutes a sufficient tender of payment under all the circumstances of this case to release any lien. Compare *Sagner v. Glenangus,* 234 Md. 156 at 169. If Glenangus had any right to disassociate itself from MacPhail and claim an independent right to payment for services exclusive of the syndication agreement, the prior action was the time and place to have asserted such right. Not having done so, it is now precluded. *White v. Athey,* 229 Md. 28, 30, 181 A. 2d 466, 467 (1962).

"Nor is Glenangus entitled to reimbursement for the periods commencing February 1, 1962 on principles of restitution. The rule stated in Section 74 of the Restatement of Restitution relied on by Glenangus applies only to the judgment debtor who has paid a judgment which is subsequently reversed. The theory permitting restitution in such circumstances is that the judgment debtor was coerced to pay the judgment (even though in many instances the only coercion is the legal duty to pay) and it would result in unjust enrichment of the judgment creditor, if he were permitted to retain the proceeds of judgment, after reversal. See Scope Note to Chapter 3, Restatement of Restitution. Any benefit bestowed on Sagner by Glenangus after January 31, 1962 was done voluntarily by Glenangus or pursuant to a judgment voluntar-

ily sought and obtained by Glenangus in direct opposition to the obvious wishes of Sagner. Under no interpretation of the facts can it be said that Glenangus was compelled or coerced to retain possession of and maintain Saggy and thus bestow benefits upon Sagner. The general rule is that one who officiously confers a benefit upon another is not entitled to reimbursement. Restatement of Restitution, section 2. The equities on this issue are clearly with Sagner against whose will Saggy was retained by Glenangus."

On the question of equities in such a situation see *Green v. Stone*, 1 H. & J. 405, 409 (1803) cited by appellants. The claim to board and keep after February 1, 1962 was properly denied.

VI. *Trial Court Properly Dismissed MacPhail's And Glenangus' Counterclaims.*

MacPhail's counterclaim and the third counterclaim of Glenangus were predicated upon an alleged agreement that MacPhail would undertake to promote the syndication of Saggy if Sagner would agree to stand the stallion at Glenangus and have MacPhail manage him. Judge Liss granted Sagner's motion for summary judgment on these counterclaims by his order of February 20, 1970. In his opinion on this question Judge Liss said: "There are no facts to establish a written, oral or implied agreement separate and distinct from the syndication agreement which was finalized in August of 1961."

We believed this subject had been put to rest in *Sagner v. Glenangus, supra.* Apparently the ghost still walks. To exorcise it forever, we hold that whatever transpired between MacPhail and Sagner prior to September 1, 1961, merged in the syndication agreement which this Court held in the prior appeal was cancelled by Sagner as of February 1, 1962.

*Judgments affirmed, the appellants to pay the costs.*