*Hess Constr. + Eng'g Servs., Inc. v. Francis O. Day Co., Inc.*
No. 1116, Sept. Term 2023
Opinion by Leahy, J.

**Contracts > Construction and Operation > General Rules of Construction > Construction as a Whole**

When a court engages in contract interpretation, it should endeavor to give effect to each clause in order to prevent "an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Cochran v. Norkunas*, 398 Md. 1, 17 (2007) (quoting *Sagner v. Glenangus Farms*, 234 Md. 156, 167 (1964)).

**Contracts > Construction and Operation > General Rules of Construction > Application to Contracts in General > Existence of Ambiguity**

When a court determines that contractual language is ambiguous, it will consider extrinsic evidence, including parol evidence, in order to ascertain the parties' intentions. *See W.F. Gebhardt & Co., Inc. v. Am. Eur. Ins. Co.*, 250 Md. App. 652, 666 (2012). We have cautioned, however, that "a contract is not ambiguous merely because the parties do not agree as to its meaning." *Maslow v. Vanguri*, 168 Md. App. 298, 319 (2006). Rather, language is ambiguous "if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning." *Cochran v. Norkunas*, 398 Md. 1, 17 (2007).

**Contracts > Construction and Operation > General Rules of Construction > Construction by Parties**

Extrinsic evidence may include "negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties." *Canaras v. Lift Truck Servs., Inc.*, 272 Md. 337, 352 (1974). "The court may also consider the special meaning which trade custom or usage attaches to certain words or terms." *Della Ratta, Inc. v. Am. Better Cmty. Devs., Inc.*, 38 Md. App. 119, 130 (1977).

**Contracts > Construction and Operation > General Rules of Construction > Language of Instrument > Construction to Give Validity and Effect to Contract**

The law "leans against" declaring entire provisions of contracts unenforceable, *Quillen v. Kelley*, 216 Md. 396, 407 (1958), and courts should not do so "unless no other course can be sensibly and reasonably followed." *Cochran v. Norkunas*, 398 Md. 1, 17 (2007) (quoting *Sagner v. Glenangus Farms*, 234 Md. 156, 167 (1964)). This principle is particularly important in the construction context, where contracts are often comprised of a series of complex, interlocking documents, layered on top of each other like the concrete blocks in a building's foundation.

**Contracts > Construction and Operation > General Rules of Construction > Application to Contracts in General > Existence of Ambiguity**

Asphalt Index Provision in construction subcontract purporting to adjust subcontract price

based on fluctuations in asphalt index is ambiguous because it is "susceptible of more than one meaning or is of doubtful meaning," given that it does not explicitly provide a method for calculating pricing changes, and no other provision in the subcontract clarifies what method the parties intended to use. *Cochran v. Norkunas*, 398 Md. 1, 17 (2007).

**Evidence > Parol or Extrinsic Evidence Affecting Writings > Particular Subjects of Parol or Extrinsic Evidence > Construction, Interpretation, or Application of Writings; Ambiguity > Nature and Existence of Ambiguity in General**

Instead of simply declaring the Asphalt Index Provision unenforceable, the circuit court should have examined parol evidence to determine which of two interpretations offered by the parties expressed their intentions at the time of the execution of the contract. *Sy-Lene of Wash., Inc. v. Starwood Urb. Retail II, LLC*, 376 Md. 157, 167-68 (2003).

**Limitation of Actions > Computation of Period of Limitation > Accrual of Right of Action or Defense > Contracts in General > Breach of Contract in General**

Correct accrual date for breach of contract claims relating to change orders under construction subcontract was the first date on which subcontractor "reasonably should have known" that contractor had determined not to pay subcontractor for all or part of the work requested in a given change order. *Est. of Adams v. Cont'l Ins. Co.*, 233 Md. App. 1, 25 (2017) (quoting *Poffenberger v. Risser*, 290 Md. 631, 636 (1981)); *see also Patriot Constr., LLC v. VK Elec. Servs., LLC*, 257 Md. App. 245, 265-66 (2023). In the instant case, contractor failed to demonstrate that subcontractor's claims accrued more than three years prior to subcontractor's suit. Accordingly, subcontractor's breach of contract claims were not barred by the applicable statute of limitations, Maryland Code (1973, 2020 Repl. Vol.), Courts & Judicial Proceedings Article § 5-101.

Circuit Court for Montgomery County
Case No. 477883V

REPORTED*

IN THE APPELLATE COURT

OF MARYLAND

No. 1116

September Term, 2023
_____

HESS CONSTRUCTION + ENGINEERING
SERVICES, INC. (n/k/a HESS
CONSTRUCTION COMPANY, LLC)

v.

FRANCIS O. DAY CO., INC.
_____

Reed,
Leahy,
Ripken,

JJ.
_____

Opinion by Leahy, J.
_____

Filed: February 28, 2025

*Tang, J. did not participate in this Court's
decision to report this opinion pursuant to Md.
Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Large-scale public construction projects customarily involve a complex suite of agreements between multiple parties that allocate design, construction, oversight, and maintenance responsibilities, and which contain elaborate payment, indemnity, and insurance provisions. These interlinking contracts and subcontracts generally add layers of complexity by incorporating and referring to other documents, including specifications, plans, indices, and codes. This appeal concerns alleged breaches of a subcontract for a public works construction project known as the "Montgomery County Multi-Agency Service Park – Public Safety Training Academy" (the "Project"). Appellant, HESS Construction + Engineering Services, Inc. n/k/a HESS Construction Company, LLC ("Hess"), served as the general contractor pursuant to a Fixed Price Construction Contract ("the Prime Contract") that it entered into with Montgomery County in October of 2014. Then in 2015, Hess entered into a Master Subcontract Agreement ("Master Subcontract") and Subcontract Agreement Rider ("SAR") (together, the "Subcontract") with appellee Francis O. Day Co., Inc. ("F.O. Day") to provide asphalt paving and related services for the Project.

Hess was obligated to pay F.O. Day for its work under the Subcontract in monthly "progress payments" and a final payment, which together would equal "the total sum of the Subcontract Price." F.O. Day was entitled to propose changes to the Subcontract Price for extra work through change orders. The Subcontract also provided for adjustments to the Subcontract Price based on fluctuations in the price of liquid asphalt, which were to be handled as change orders issued by Hess.

During the course of F.O. Day's performance under the Subcontract, Hess denied several of F.O. Day's proposed change orders seeking upward adjustments of the Subcontract Price for extra work. F.O. Day claimed that site conditions, including problems with the grading and elevation of the Project site, required F.O. Day to complete a substantial amount of predicate work before undertaking the asphalt paving work assigned to F.O. Day under the Project specifications.

On the other side of the equation, Hess issued a series of "Asphalt Escalation Credit" change orders by which it reduced the Subcontract Price based on decreases in the Maryland State Highway Administration's asphalt index. F.O. Day's ensuing protests of these change orders ballooned into a disagreement between the parties over what formula they had agreed to use for calculating adjustments based on fluctuations in the asphalt index.

The Subcontract work was completed on or about May 15, 2017. For several months thereafter, the parties engaged in discussions to resolve these change order disputes, but to no avail. Consequently, on January 17, 2020, F.O. Day filed a two-count complaint in the Circuit Court for Montgomery County against Hess alleging breach of contract and violation of the Maryland Prompt Payment Statute.

Following a four-day bench trial in May 2021, the court took the matter under advisement. On July 5, 2023, the court issued an opinion in which it denied F.O. Day's Maryland Prompt Payment Statute claims but awarded F.O. Day a total of $469,523.80 in damages on its breach of contract claims. The court determined that the provision of the Subcontract governing adjustments based on the asphalt price index was unenforceable

2

because there was no meeting of the minds. The damages award, therefore, was based, in part, on the court's finding that Hess improperly reduced the Subcontract Price by $348,655.39 based on the asphalt index. The court also found that Hess improperly rejected several of F.O. Day's proposed change orders totaling $121,866.71.

Hess timely noted this appeal on August 3, 2023. Hess challenges the circuit court's damages award under the "clear and unambiguous" language of the Subcontract, and also claims a portion of the award is barred by the statute of limitations. To give context to the particularized questions presented on appeal, we first set out the background facts.

## BACKGROUND

### A.    Formation of the Subcontract

The parties memorialized their agreement in two separate documents. On March 12, 2015, the parties entered into the Master Subcontract, which sets out "general terms and conditions" that apply to any project[1] for which F.O. Day serves as a subcontractor for Hess, including the Project. On July 15, 2015, the parties entered into the SAR, which supplements the MSA with additional terms specific to the Project.

The SAR requires F.O. Day to provide "all labor, equipment, materials, scaffolding, hoisting and incidentals to complete all Asphalt Paving work" for the Project, subject to the plans and specifications of Hess under the Subcontract. It outlines the "scope of work" that F.O. Day is responsible for performing under the Subcontract and specifies that F.O.

---

[1] The MSA provides that "[a]ll terms and conditions specific to each particular project will be addressed in a project specific [SAR.]" There is nothing in the record to indicate that the parties have applied the terms of the MSA to any other project.

Day is entitled to a "Subcontract Price" of $2,636,000.00 as base pay for its work on the

Project.   This Subcontract Price is subject to adjustment according to the following

"Asphalt Index Provision" – one of several provisions itemized in the SAR scope of work:

> 21. *Pricing is based on the asphalt index of 562.50 and any increase or decrease will be handled as a change order at time of placement.*[2]

Provisions within the Master Subcontract governing payment, including any

withholding of payment by Hess, state as follows:

> 5.5 <u>Withholding Payments</u>.  Progress payments may be withheld by [Hess], in whole or in part, on account of: (a) claims or liens by any subcontractor or supplier of [F.O. Day], or any notice thereof arising out of the Subcontract; (b) any breach by [F.O. Day] of any provision or obligation in the Subcontract Documents; (c) unsatisfactory prosecution of the Work or failure to carry out the Work in accordance with the Subcontract Documents; (d) a reasonable doubt that the Work can be completed for the balance of the Subcontract Price then unpaid or within the required time.  [Hess] shall not be in Default by reason of reasonably withholding payment based on any of the above grounds . . . . [I]n the event of a payment dispute . . . [F.O. Day] shall proceed diligently with the performance of the Work, including the disputed Work, and shall be entitled to reserve its right to make a claim.

***

> 6.1 <u>Changes in the Work</u>.  [Hess] may, by written notice and without notice to [F.O. Day's] surety(ies), direct [F.O. Day] to make changes, additions and/or deletions in the Work.  [F.O. Day] shall promptly proceed in compliance with such written instructions as set forth herein . . . .  Any increase or decrease in the Subcontract Price and/or extension of time shall be agreed upon in writing by the Parties in the form set forth in SAR Exhibit C, Change Order.  If the Parties cannot agree to the increase or decrease in the Subcontract Price and/or an extension of time, [F.O. Day] shall proceed with the change, addition or deletion in the Work, notwithstanding any dispute, upon [Hess's] direction. [F.O. Day] may propose changes, additions and/or deletions to the Subcontract Documents within five (5) days of the event giving rise to the change, addition and/or deletion, but in any event

---

[2] Additional provisions in the SAR scope of work are discussed, where relevant, throughout this opinion.

4

before such changed, additional or deleted Work is performed, which is a condition precedent to payment for such change.  [Hess] does not have any obligations to accept [F.O. Day's] request for a change. Disputes regarding changes shall proceed in accordance with Article 12.

***

12.2 [F.O. Day] specifically agrees that any dispute with Owner or [Hess] shall not interfere with [F.O. Day's] progress of its work in any manner, and that [F.O. Day] shall proceed with its work as ordered, subject to claim. [F.O. Day's] failure to do so shall be considered a material breach and Default of contract, justifying termination under Article 11.

F.O. Day agreed to begin work under the Subcontract "in a prompt and diligent manner" after receiving "Notice to Proceed" from Hess, "at such time and in such sequence as [Hess]" directed.  Hess was entitled under the Subcontract to "modify and change the schedule" for F.O. Day's work as it deemed appropriate.  F.O. Day was entitled to receive payment "within seven (7) days of [Montgomery County's] payment to [Hess] for [F.O. Day's] Work."

Hess gave F.O. Day Notice to Proceed on November 24, 2015.  F.O. Day completed performance on the Project on or about May 15, 2017.

### B.     Hess's Proposed Change Orders

After F.O. Day began work under the Subcontract, Hess issued several change orders decreasing the Subcontract Price "as a result of the decreases in the asphalt index." Hess's "Change Order No. 00002," issued on June 21, 2016, provided for a decrease of $185,956.53 for "FO Day Credit for Asphalt Escalation per item #21 in the SAR Scope of Work," which applied to all asphalt already placed "up until 6/15/16."  Hess attached a spreadsheet to the change order, entitled "PSTA Liquid Asphalt Credit Index," that

recorded the asphalt index price on each date that F.O. Day had received delivery of asphalt mix to be used in its work on the Project.

As shown on Appendix A to this opinion, the spreadsheet included columns for the "Tonnage Placed" on each date, the percentage of "Liquid Asphalt per Mix Design," and two cost calculations – the "Per Contract Cost of Tonnage Placed" and the "Actual Cost of Tonnage Placed." In the final column, Hess recorded the "CREDIT BACK TO HESS" corresponding to each placement date. The bottom of this column showed a $185,956.53 total decrease to the Subcontract Price. Hess also attached a memorandum from the Maryland State Highway Administration ("SHA") that included the price of asphalt in June 2016, a graph showing the change in the SHA "Office of Construction Liquid Asphalt Cement Price" for each month from February 2015 to June 2016, the delivery tickets from each delivery of asphalt to the Project site, and a series of "Mix Design Reports" reflecting the percentage of liquid asphalt in the asphalt mix delivered to the Project site.[3]

Change Order No. 00002 was signed and approved by Francis O. "Michael" Day IV, Vice President of F.O. Day, on June 28, 2016, and Hess's Project Executive, Dave Gauthier, signed noting final approval about a month later. On September 13, 2016, Hess

---

[3] At trial, F.O. Day's Vice President, Francis O. "Michael" Day IV, acknowledged that he received these materials with Change Order No. 00002. After Hess's counsel walked him through the materials, Day stated that it "appear[ed]" Hess had taken "the price per the contract of [$562.50], multipl[ied] it times the tonnage placed on that particular date," then multiplied "that same tonnage times the actual price at the date of placement" and taken the difference between the two as part of its calculations. However, Day maintained that these calculations did not reflect the parties' agreement, and that the language "any increase or decrease" in the Asphalt Index Provision "refers to a change in the asphalt index . . . [not] the calculations" on Appendix A.

6

issued "Change Order No. 00005," again showing a reduction in the Subcontract Price for "Asphalt Escalation per item #21 in the SAR Scope of Work." Change Order No. 00005 provided for a decrease of $111,685.71, and again included the same PSTA Liquid Asphalt Credit Index spreadsheet, this time reflecting the reduction for all asphalt placed after June 15, 2016. F.O. Day did not sign Change Order No. 00005. On November 21, 2016, Hess issued "Change Order No. 00009," showing another Subcontract Price reduction of $242,433.65 based on asphalt price index decreases, which F.O. Day also did not sign. At trial, Michael Day testified that Hess did not "provide[] the calculation" used to arrive at the amount of the reductions, so F.O. Day was not "sure which formula was used" to calculate the adjustment.[4] In an email dated December 1, 2016, F.O. Day informed Hess that F.O. Day was rejecting Change Order No. 00009 because it suspected Hess had used a calculation method that "ignore[d] the project specifications resulting in an incorrect calculation of the adjustment." F.O. Day referenced a November 11, 2016 meeting that the parties held "to resolve the change order log and outstanding change orders[,]" and acknowledged that the parties had "not resolved the best way to move forward and reconcile the outstanding [change orders] and project accounting noted on them."

Hess sent a "formal response" on December 2, 2016, in which it acknowledged that F.O. Day disputed the method of calculation used but pointed out that "Change Order [No. 00002] was fully executed without any notice from F.O. Day that there was an issue." Hess

---

[4] From the transcript, it appears Day was asserting that F.O. Day did not receive the same spreadsheet sent with Change Order Nos. 00002 and 00005 when Hess sent No. 00009.

argued that F.O. Day "mistakenly believe[d]" that the Asphalt Index Provision included "a 5% fluctuation calculation resulting in the first 5% of any increase or decrease not being included in the price adjustment," as contained in the SHA formula. Hess insisted that the SHA formula did not apply to the Subcontract, and that instead, changes to the Subcontract Price "should be calculated strictly based on the $562.50 price included in the [SAR] less the price of asphalt at the time of placement[.]"

F.O. Day responded to this letter by email on December 5, 2016, indicating that it disagreed with Hess's understanding of the Subcontract and asking for the "calculation sheet used to develop the adjustment." F.O. Day also stated that it appeared the tonnage of asphalt delivered to the Project site during the time period covered by Change Order No. 00009 was "significantly over stated (by a multiple of almost 10)." Although Hess stood firm on its interpretation of the Asphalt Index Provision, it did recognize that it made a tonnage calculation error in Change Order 9. Therefore, Hess issued Change Order #11 on December 13, 2016, adding back $217,970.50 to the Subcontract Price.

In sum, by December 2016, three change orders concerning "Asphalt Escalation Credits" remained in dispute: (1) Change Order No. 00002 in the amount of $185,956.53; (2) Change Order No. 00005 in the amount of $111,685.71; and (3) Change Order No. 00009 (as corrected by Change Order No. 00011) in the amount of $24,463.15.

Thereafter, Hess issued "Change Order No. 00016" on October 26, 2017, reflecting a decrease to the Subcontract Price in the amount of $26,550.00, with the description "Liquid Asphalt Credit/Tack Coats." Again, F.O. Day did not sign this change order. On March 9, 2017, Hess followed up on Change Order No. 00016, and F.O. Day responded

8

that "there is no credit due for 'tack coat' on the [Project][,]" as F.O. Day "does not use liquid asphalt for tack coat operations" and had "never had a price adjustment on any job for tack coat[.]" F.O. Day further stated that Change Order No. 00016 was based on a misunderstanding of the Asphalt Index Provision, and that it did not see "the connection between an asphalt index and tack coat." Hess responded that "[t]ack is made of liquid asphalt," and requested an accounting of the amount of tack used by F.O. Day on the Project. F.O. Day provided an estimate but maintained that "the price of tack did not fluctuate with the asphalt index" and was "not dependent on fluctuations in the price of [liquid asphalt]."

## C.     F.O. Day's Proposed Change Orders

Following receipt of Hess's official Notice to Proceed in November 2015, F.O. Day's Operations Manager, David Wolff, told Hess's Senior Project Manager, David McMaster, that F.O. Day felt it had "been misled on the status of completion of predicate work" necessary for it to begin its paving operations. Wolff identified problems with the grading and elevation of the Project site, the ability of trucks to enter and exit the site, and saturation of the site preventing the application of paving stone. Wolff informed McMaster that F.O. Day could not begin paving until these issues were addressed, and that Hess's expectation that F.O. Day complete its paving work by December 15, 2015 was "wholly unrealistic" because the Project site was "inaccessible" and "predicate work [was] incomplete." Wolff asked McMaster to notify F.O. Day when the Project site was "actually available for work," so that it could "mobilize to the site."

According to Thomas Gerhold, F.O. Day's Chief Surveyor and Director of GPS

9

Operations, Hess informed F.O. Day on December 7 that it had addressed the problems with the Project site and that the site was now ready for paving. However, when F.O. Day returned to the site, it determined that there were still numerous issues. Specifically, a grade check conducted by F.O. Day on December 8 revealed that the grades and elevations were still incorrect, meaning that F.O. Day could not pave the Project site in line with the terms of the Subcontract. Bobby C. "Kip" Gwinn, Senior Project Manager for F.O. Day, informed Hess that "excessive pumping" had rendered the ground inadequate for paving. In a December 21 letter to Hess, F.O. Day emphasized that it "should not absorb the costs" of conducting repeated grade checks at the Project site and demanded "that these costs be borne by [Hess]." F.O. Day requested that going forward, Hess perform proof rolls of any part of the site it wished F.O. Day to pave before notifying F.O. Day that the site was ready.

Hess responded the next day, claiming that F.O. Day had impermissibly delayed beginning work and failed to request that Hess conduct additional surveys of the site. F.O. Day replied that it had requested additional surveys as early as December 2, and that it was not required to request that Hess "comply with the terms of its own contract" by providing surveys. F.O. Day reemphasized that the site was still not suitable for it to perform its work. F.O. Day further informed Hess that its asphalt plant would be closing for the winter on January 8, 2016, but that it was prepared to perform "any work available" prior to that date, provided Hess brought the Project site into "compliance with the contractual obligations" of the Subcontract. F.O. Day continued pressing the issue of inadequate site conditions throughout the course of the Project, emphasizing that its repeated grade checks of the site were "at the sole cost of [Hess]."

Other problems with the work that was to be completed by other subcontractors surfaced a few months later. On April 27, 2016, Hess sent F.O. Day a letter stating that F.O. Day's paving was "high" around Inlet #934 ("I-934"), a depression in the road designed to facilitate drainage. The letter instructed F.O. Day to "have the base paving and intermediate paving removed, [and] stone base lowered to accommodate the proper elevations required to meet the water drainage to I-934."

On May 2, 2016, F.O. Day responded that it was "in no way responsible for the conditions highlighted" because Hess had directed F.O. Day to pave the area, and any issue with the paving was "the direct result of improper layout, design conflicts, and/or improper sub-grade preparation," which F.O. Day did not conduct. Hess was advised that F.O. Day would expect additional payment from Hess to make the repairs because "survey and layout [of] the Work is by others and specifically excluded from [the SAR]." Hess responded the next day, warning that "[s]hould the work not take place during this cure period (uncover and repair), [Hess] w[ould] be forced to supplement the work," and that payment to F.O. Day for the paving work would be withheld. Then on May 25, Hess informed F.O. Day that if it did not "confirm . . . by 2pm today that [F.O. Day] will be onsite tomorrow am making the repairs," Hess would assign the repair to another subcontractor at cost to F.O. Day. F.O. Day responded that it would complete the requested repairs but advised that the work would be performed under protest.

On September 12, 2016, F.O. Day sent Hess Proposed Change Order #011 ("PCO 11") requesting that Hess add $22,110.17 to the Subcontract Price for "costs associated with . . . Asphalt Repairs [at] Cityscape at I-934." F.O. Day attached a "Price Breakdown"

11

to PCO 11, dated July 22, 2016, which itemized its labor, equipment, and materials costs in performing the asphalt repairs on I-934, along with receipts. F.O. Day also sent Hess Proposed Change Order #034 ("PCO 34") on March 6, 2017, demanding $101,258 for "multiple grade checks, performing as-built of works by others, and numerous changes to the GPS Model to match existing conditions as they were in conflict with the [Subcontract]." Again, F.O. Day attached a Price Breakdown itemizing its costs, but also included a handwritten document listing each grade check performed over the course of F.O. Day's work on the Project and the corresponding date. Hess ultimately refused to pay F.O. Day the amounts it demanded under PCO 11 and PCO 34.

### D. Circuit Court Proceedings

On January 17, 2020, F.O. Day sued Hess in the Circuit Court for Montgomery County, alleging that Hess had breached the Subcontract and violated the Maryland Prompt Payment Statute, Maryland Code (1974, 2015 Repl. Vol, 2019 Supp.), Real Property Article ("RP"), §§ 9-301-9-304. The first count of F.O. Day's complaint alleged that it had "performed all of its obligations under the contracts," but that Hess still owed F.O. Day an additional $553,051.25 under the Subcontract for "additional work, change orders and delays," including the work described in PCO 11 and PCO 34.[5] F.O. Day also alleged that the Asphalt Index Provision was unenforceable because Hess had failed to include "any language detailing how a price adjustment for asphalt would be calculated" in the SAR. In the second count of its complaint, F.O. Day argued that Hess's failure to pay the amount

---

[5] By the time the circuit court issued its memorandum opinion, this number was reduced to $528,603.52.

12

alleged in count one "[f]or well over thirty (30) days" constituted a violation of the Prompt Payment Statute.

Hess filed an answer in which it generally denied all of F.O. Day's allegations and asserted various affirmative defenses. Specifically, Hess took the position that F.O. Day had failed "to comply with the requirements, terms and conditions of [the Subcontract], including but not limited to the provision of notice and submission of claims in a timely manner." Furthermore, Hess alleged that F.O. Day had "failed to properly perform its work on the Project and/or breached [the Subcontract]."

*The Trial*

The action was tried to the court on May 24-26 and May 28, 2021. The circuit court heard testimony from both F.O. Day's and Hess's employees. David Wolff testified about the site conditions and problems he and his team encountered with the predicate work on site. According to Wolff, it was the job of "Hess's site contractor, Total Contracting" to ensure that the subgrade was in adequate condition for F.O. Day to conduct its paving work. He explained that after receiving Notice to Proceed from Hess on November 24, 2015, F.O. Day scheduled a "proof roll" for November 30, during which it would drive a "loaded vehicle" over the site to determine whether the "subgrade" ground at the site was "firm enough" to pave. However, this proof roll was canceled after Hess informed F.O. Day that it could not be performed on "wet or frozen ground." Regardless, F.O. Day's surveyor reported that the "site was not ready" for paving to begin on November 30.

Wolff explained that performing a "stakeout" to "give [] elevation points, . . . to ensure that the project is being built in accordance with the plans" is typically the duty of

13

a surveyor, and not a paving subcontractor like F.O. Day. He stated that performing stakeouts was not part of F.O. Day's obligations under the Subcontract. He said it was obvious that the Project site was "not to the proper elevations" when F.O. Day first went out to begin work after receiving Notice to Proceed. Nevertheless, Hess continually insisted that F.O. Day "continue to work" and complete asphalt paving on certain areas of the Project site by December 15, 2015. Wolff recounted that F.O. Day conducted additional tests and determined that: "the grades were out of tolerance," meaning they did not match Project specifications; part of the site's "dimensions were incorrect for the paving foundation"; and overall, the site "wasn't fully ready" for asphalt paving. Hess nevertheless "claimed that the areas were ready," and required F.O. Day to continue returning to the site and perform "a number of proof rolls," all of which demonstrated that the site was not prepared properly.

Kip Gwinn testified that F.O. Day had no obligation under the Subcontract "to pull final grades . . . and elevations," and that it had developed a GPS survey model for the Project strictly for its own use and "nothing to do with the stakeout." Gwinn explained that "no engineering, surveying, and/or layout" was to be completed by F.O. Day under the Subcontract. Though Gwinn acknowledged that F.O. Day was required to check the quality of the preliminary work performed by prior subcontractors, he nevertheless stated that F.O. Day was not obligated to check things "to this extent." He explained that the "tolerances" – the amount of deviation from Project specifications permitted under the Subcontract – were "very tight" as compared to other projects F.O. Day had worked on, and that as a result, he had a "surveyor and his helper" at the site every day who "checked

14

everything, which is not normal." Gwinn testified that the Project "had a lot of problems," and that checking for inconsistencies required F.O. Day to perform multiple surveys and grade checks of the Project site, which required two people "[a]t the minimum." According to Gwinn, the additional compensation demanded in PCO 34 was for the equipment and labor for these two individuals to perform survey and grade check work. Gwinn acknowledged that F.O. Day "never did any stake-out work at the request of Hess," but did complete grade checks at Hess's direction.

Thomas Gerhold testified about the GPS model F.O. Day used on the Project. He explained that the development of GPS models made surveying "a lot faster," and that F.O. Day used GPS to ensure its paving conformed to the "elevations and locations" specified by Hess for the Project. Gerhold developed the GPS model for the Project to be used "in conjunction with the stakeout" provided by Hess at the beginning of the Project. However, when Gerhold attempted to survey the site on December 8, 2015, so that F.O. Day could begin paving, he found that there were only "a few" stakes at the site, and that Hess had not "staked out and made ready the surrounding area" where F.O. Day had been instructed to pave. In fact, Gerhold added, none of the areas Hess had said were ready for paving could have been paved "to the requirements on the contract drawing." Gerhold stated that after the I-934 "fiasco" occurred, Hess told F.O. Day that they would have to "do a lot of additional checking" of preliminary work, which meant that Gerhold had to check Hess's "stakes to make sure that they didn't have more mistakes again." Gerhold testified that he ultimately had to build nineteen different GPS models for the Project, because on eighteen different occasions F.O. Day identified an area of the site that did not match the initial

15

model and was instructed by Hess to match the model to the conditions at the site. According to Gerhold, this was not "typical for the work that's done" after a general contractor provides F.O. Day with "finished grades . . . for placement of pavement."

Michael Day confirmed that the stakeout provided by Hess was "not adequate" for F.O. Day to conduct its work, and that F.O. Day had informed Hess of this fact. He explained that stakeout work, as part of "layout and engineering," was expressly excluded from F.O. Day's scope of work under the Subcontract. He described the work that goes into asphalt paving, emphasizing that at multiple steps in the process, paving subcontractors have to "pull string line" placed as part of the stakeout to ensure that the grading of the site is within tolerance and to verify that the asphalt is being paved at the "proper thickness." He said that F.O. Day "would have no way of building the project without stake out," so F.O. Day ultimately did its own stakeouts when Hess "did not, in fact, satisfy the requirements that were contained" in the Subcontract.

Regarding the Asphalt Index Provision of the Subcontract, Michael Day testified that Hess and F.O. Day never agreed "to a formula for any increase or decrease that was to be handled as a change order." He stated that he initially understood the formula provided in the Standard Specifications for Construction and Materials ("SHA Specs") to be the method for calculating adjustments to the Subcontract Price based on changes to the asphalt index, and that F.O. Day had "never used another formula on public works jobs." He initially assumed that Hess had used the SHA formula at the time he signed Change Order No. 00002. He testified that he only realized Hess was using a different formula when he received Change Order No. 00005.

16

On Hess's side, Dave Gauthier testified that he understood the MSA to require F.O. Day, with respect to predicate work, to "do some quality control to make sure [its] material fits the way it's supposed to" in the areas designated. Gauthier recounted that for "survey, stakeout, [and] layout," Hess had hired "a licensed surveyor to perform all of the [] survey for the job." He added that Hess "never directed or required F.O. Day to do any engineering," and that a "grade check and engineering" are not the same thing. F.O. Day was merely asked to check "elevations and grades based on [Hess's] stakeout to make sure it's correct." Gauthier also clarified that Hess initially misunderstood F.O. Day's use of GPS to mean Hess did not "need to do stakeout for F.O. Day because [F.O. Day was] going to use their GPS," though Hess eventually realized its mistake before F.O. Day began performance.

*Memorandum Opinion and Order*

In a memorandum opinion and order dated July 5, 2023, the Circuit Court for Montgomery County held that Hess was liable for breach of contract and awarded damages in the amount of $469,523.80 to F.O. Day. The court found that "the SAR's scope of work does not include layout and engineering" because "[b]oth were originally included in the printed agreement but crossed out" in the executed version of the Subcontract. Accordingly, the court resolved that Hess was responsible for the additional "survey, engineering, and layout work" detailed in PCO 34 because Hess directed F.O. Day to begin paving even after F.O. Day, as directed under section 2.10 of the Master Subcontract, alerted Hess to "discrepancies" at the Project site.

Additionally, the court rejected Hess's argument that the statute of limitations

17

barred F.O. Day's claim concerning PCO 34. Hess had argued that the statute of limitations began to run "on or before October 19, 2016," when the work that was the subject of PCO 34 was completed, but the court concluded that F.O. Day's claim could not have accrued before May 2017, when Hess "rejected" PCO 34. The court awarded F.O. Day $101,258.24 in damages for its claims under PCO 34.

The court also found that Hess was liable for the repairs at Inlet 934 because "Hess and its other subcontractors were responsible for this work[,]" and F.O. Day performed "the work under protest because there had been a directive" from Hess. Although the court did not explicitly state that the statute of limitations did not bar F.O. Day's claim for this work, it is clear from the context that the court applied the same reasoning. Thus, the court awarded F.O. Day $19,610.17 in damages, subtracting $2,500 from its claim under PCO 11 for "move-in of the equipment required to perform the work[.]"

Turning to the dispute between the parties regarding the Asphalt Index Provision, the court noted that Hess claimed credits for a decrease in the cost of asphalt under Hess's Change Order Nos. 00002, 00005, 00009, and 00011, totaling $322,105.39. The court observed:

> The SAR provides: "Pricing is based on the asphalt index of $562.50 and any increase or decrease will be handled as a change order at time of placement." While the SAR determines the method to adjust a change in asphalt price, there is no clear or defined way for the asphalt credit to be calculated. The SAR does not specify (1) whether any asphalt credit would be based on percentage, (2) whether there are limitations on price changes, or (3) for what percentage of the initial estimate the asphalt credit would be apply [sic].

> The court concluded that, "[w]ithout agreement on these terms, there was no mutual assent regarding the calculation of the asphalt price adjustment." The court rejected Hess's

18

argument that F.O. Day's execution of Change Order No. 00002 evidenced the parties' mutual assent to a method of calculating the asphalt price adjustment. The court pointed out that "Change Order #2 contains no method of calculating the adjustment," and noted that Michael Day testified that he understood the adjustment would be calculated based on the SHA formula that "is standard for all public works jobs, and Mr. Day [was] unaware of any other formula." Ultimately the court determined that the Asphalt Index Provision was unenforceable because the parties did not "express their intention in a manner that is capable of understanding." The court applied the same reasoning in determining that Hess could not obtain any credit for "Liquid Asphalt Credit/Tack Coats" pursuant to Change Order No. 00016. The court thus awarded F.O. Day damages in the amount of $322,105.39 for the asphalt price adjustments made in Change Order Nos. 00002, 00005, and 00009 and $26,550 for the adjustment made in Change Order No. 00016 for the Tack Coats credit.

F.O. Day's claims for asphalt resurfacing in the amount of $2,500, loss of production in the amount of $1,826, and delay-related losses in the amount of $29,753 were denied by the court as either within the scope of the Subcontract or waived.

Finally, the court found that F.O. Day could not recover under Maryland's Prompt Payment Statute because its claims were not undisputed, and because F.O. Day failed to prove that Hess did not make payment to F.O. Day within seven days after its receipt of payment under the Prime Contract for F.O. Day's work. The court summarized its decision as follows:

> Hess breached the Agreement with F.O. Day by failing to pay F.O. Day the amounts due for survey, engineering, and layout costs and repairs at Inlet 934. Hess also breached the Agreement with F.O. Day by taking credits

19

against amounts due F.O. Day for asphalt and tack coats. F.O. Day is entitled to $469,523.80 in damages[.]

Hess timely noted this appeal on August 3, 2023, and presents three issues for our review, which we rephrase and reorder as follows:[6]

I.      Did the circuit court err in concluding that the Subcontract's Asphalt Index Provision was unenforceable and awarding F.O. Day $348,655.39 in damages for asphalt price adjustments?

II.      Did the circuit court err in determining that F.O. Day's claim for damages in the amount of $101,258.24 for additional work was not barred by the statute of limitations?

III.      Did the circuit court err in concluding that F.O. Day was entitled to $101,258.24 in damages for additional survey, engineering, and layout work under the Subcontract?

We supplement these facts in our discussion of the issues.

---

[6] In its brief, Hess presented the following questions:

    I. Did the Trial Court err in refusing to enforce and give effect to the clear and unambiguous asphalt index price adjustment provision of the Contract and thus err in awarding F.O. Day $348,655.39 in damages for asphalt price adjustments?

    II. Did the Trial Court err in refusing to enforce and give effect to the clear and unambiguous language of Sections 2.2 and 2.10 of the Contract and thus err in awarding F.O. Day $101,258.24 in damages for "additional" survey, engineering and layout work?

    III. Did the Trial Court err in failing to apply the statute of limitations (as provided by Md. Code Ann., Cts. & Jud. Proc. § 5-101) to bar as untimely F.O. Day's claims for survey, engineering and layout work as well as Inlet-934 repair work and thus err in awarding F.O. Day $121,866.71 in damages for those claims?

# DISCUSSION

## I.

## Enforceability of the Asphalt Index Provision

### Parties' Contentions

Hess argues that the circuit court should have enforced the Subcontract's Asphalt Index Provision because it "was negotiated at arms-length, between two sophisticated and experienced commercial construction companies, and [i]s clear and unambiguous." Hess asserts the parties had a "meeting of the minds" because F.O. Day "insisted" that the provision be included in the SAR and F.O. Day's signature on the SAR demonstrates it "assented to both the inclusion of the Asphalt Index Provision in the Subcontract and the language of the Provision itself." Hess posits that the Asphalt Index Provision includes all essential terms and "clearly provides that the [adjustment for changes in the asphalt index] is based simply on a decrease or increase in the asphalt index rate of [$]562.50 and not based on any 'percentage adjustment.'" Hess disagrees with the trial court's finding that the provision failed to specify whether there are "limitations on price changes" and what "percentage of the initial estimate" for the Subcontract Price is impacted by a change in the asphalt index. Hess contends the provision already addresses both these concerns by stating that **"_any_"** increase or decrease in the asphalt index applies "to the pricing of the asphalt material as a whole."

Hess maintains that F.O. Day "accepted both the initial price adjustments made by [Hess] and the method for calculating those adjustments" when it signed Change Order No. 00002 because it contained "a worksheet illustrating that the adjustment was calculated

21

based on the asphalt index price at the time of placement and capturing the delta between that price and the Subcontract's [$]562.50 benchmark." Therefore, Hess contends, by signing Change Order No. 00002 "without any question, objection or dispute," F.O. Day demonstrated sufficient assent and understanding for a meeting of the minds to take place.

F.O. Day counters that it never agreed to Hess's "arbitrary calculation of asphalt price adjustments that was not set forth in the [Subc]ontract" and that the calculation method that Hess used was "inconsistent with the typical manner of calculating such credits in the paving industry." According to F.O. Day, the circuit court "correctly found that the ad hoc method of calculation that Hess came up with is not conveyed, much less clearly and unambiguously, within" the Asphalt Index Provision. F.O. Day asserts that Hess's "application of the calculation to tack coat – a manufactured product which . . . does not fluctuate in price like virgin liquid asphalt" is likewise not supported by the language of the Subcontract. F.O. Day points to the "differing interpretations each party applied to the [A]sphalt [I]ndex [P]rovision" as evidence that "there was no meeting of the minds as to the essential term necessary to give effect" to the provision. Even if there was a meeting of the minds, F.O. Day argues, the Asphalt Index Provision is ambiguous, and the circuit court's conclusion that the provision was unenforceable would have to be remanded so that court could "take evidence, including extrinsic parol evidence, to determine the parties' intent" and resolve the ambiguity.

**Legal Framework**

In Maryland, "[t]he interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law, subject to *de novo* review." *Sy-Lene*

22

*of Wash., Inc. v. Starwood Urb. Retail II, LLC*, 376 Md. 157, 163 (2003). "Maryland courts subscribe to the objective theory of contract interpretation[,]" by which they "interpret the contract based on what a reasonable person in the position of the parties would have understood the language to mean[.]" *W.F. Gebhardt & Co., Inc. v. Am. Eur. Ins. Co.*, 250 Md. App. 652, 666 (2021) (internal quotations omitted). When a court engages in contract interpretation, it should endeavor to give effect to each clause in order to prevent "an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Cochran v. Norkunas*, 398 Md. 1, 17 (2007) (quoting *Sagner v. Glenangus Farms*, 234 Md. 156, 167 (1964)). Courts focus primarily on the "customary, ordinary, and accepted meaning of the language used[,]" *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660 (2006) (internal quotation omitted), and "attempt to construe the contract as a whole, interpreting 'separate provisions harmoniously[.]'" *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 487 Md. 385, 403 (2024) (quoting *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 396 (2019)). In other words, courts "do not interpret contractual language in a vacuum" but rather in the context of "the text of the entire contract." *Id.* at 401 (quoting *Johnson*, 466 Md. at 394).

When a court determines that contractual language is ambiguous it will consider extrinsic evidence, including parol evidence, in order to ascertain the parties' intentions. *See W.F. Gebhardt & Co., Inc.*, 250 Md. App. at 666. We have cautioned, however, that "a contract is not ambiguous merely because the parties do not agree as to its meaning." *Maslow v. Vanguri*, 168 Md. App. 298, 319 (2006). Rather, language is ambiguous "if, to a reasonable person, the language used is susceptible of more than one meaning or is of

23

doubtful meaning." *Cochran*, 398 Md. at 17. As noted, once a court determines that a provision in a contract is ambiguous, it "must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Sy-Lene of Wash., Inc.*, 376 Md. at 167-68 (quoting *Cnty. Comm'rs of Charles Cnty. v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 445 (2001)). "To be admissible, extrinsic evidence of intent as to the meaning of a contract term must demonstrate 'an intent made manifest, not a secret intent' at the time of contract formation." *Impac Mortg. Holdings, Inc. v. Timm*, 474 Md. 495, 508 (2021) (quoting *Gov't Emps. Ins. Co. v. Coppage*, 240 Md. 17, 25-26 (1965)). This follows from the universally accepted principle that "a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract." *Cochran*, 398 Md. at 14. In determining whether the parties have mutually assented, "the inquiry will focus not on the question of whether the subjective minds of the parties have met, but on whether their outward expression of assent is sufficient to form a contract." Williston on Contracts, § 4:1 (4th ed. 2024).

Extrinsic evidence may include "negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties." *Canaras v. Lift Truck Servs., Inc.*, 272 Md. 337, 352 (1974). "The court may also consider the special meaning which trade custom or usage attaches to certain words or terms." *Della Ratta, Inc. v. Am. Better Cmty. Devs., Inc.*, 38 Md. App. 119, 130 (1977). "[C]ommunications between the parties about a contract subsequent to the execution of that contract may be admissible 'as evidence of an interpretation by both parties.'" *Timm*, 474 Md. at 508 (quoting *Hurt v. Penn. Threshermen Farmers' Mut. Cas.*

24

*Ins. Co.*, 175 Md. 403, 407 (1938)). Furthermore, "language in a contract prepared and concluded by one party is to be construed against that party if there is any ambiguity or uncertainty[.]" *Canaras*, 272 Md. at 356; *see also Johnson*, 466 Md. at 399 ("[A] contract will be 'most strongly construed against' its drafter when a court finds the contractual terms at issue to be ambiguous." (quoting *Prima Paint Corp. v. Ammerman*, 264 Md. 392, 395 (1972))).

Courts must be mindful that "[t]he law does not favor, but leans against the destruction of contracts because of uncertainty[.]" *Quillen v. Kelley*, 216 Md. 396, 407 (1958). The fact that the parties offer differing interpretations of a contract provision does not, in and of itself, render that provision unenforceable. The court's task is to take the "outward expressions of the parties and ask what meaning the words should have conveyed to a reasonable person cognizant of the relationship between the parties and all of the antecedent and surrounding facts and circumstances." Williston, *supra*, at § 4:1. "[I]f the intention of the parties can be clearly discovered, the court will give effect to it and construe the words accordingly," regardless of "the inaccuracy of expression or the inaptness of the words used." *Id.* at § 30:2.

## Analysis

The Master Subcontract, Section 14.5, provides that "[i]f any term, provision, covenant, or condition of this Agreement is held invalid or unenforceable for any reason, the remainder of the provisions shall continue in full force and effect"; thus, we assess the enforceability of the Asphalt Index Provision without considering the enforceability of the Subcontract as a whole. Still, in order to understand the meaning of the Asphalt Index

Provision, we must read it in the context of the entire Subcontract. *See Lithko Contracting, LLC*, 487 Md. at 401.

The purpose of the Asphalt Index Provision is evident from its plain language:

> 21. Pricing is based on the asphalt index of 562.50 and any increase or decrease will be handled as a change order at time of placement.

(Emphasis removed). It is clear that the parties agreed that the Subcontract Price is based on the "asphalt index of 562.50."[7] The parties also agreed to handle any "increase or decrease" through a "change order at the time of placement." The record further establishes that: (1) F.O. Day negotiated for the inclusion of a provision in the SAR by which the Subcontract Price could be adjusted based on the asphalt index; (2) Hess drafted the language of the Asphalt Index Provision and added it to the SAR;[8] and (3) each party assented to the Asphalt Index Provision by written signature. *See Cochran*, 398 Md. at 14 ("[C]ommon to all manifestations of acceptance is a demonstration that the parties had an actual meeting of the minds regarding contract formation."); *Walther v. Sovereign Bank*, 386 Md. 412, 430 (2005) ("[A] party that voluntarily signs a contract agrees to be bound by the terms of that contract."). We can "sensibly and reasonably" conclude from the foregoing acts, and the language of the Asphalt Index Provision itself, that the parties

---

[7] Though the Asphalt Index Provision does not explicitly state which "asphalt index" it refers to, the parties do not dispute that the provision refers to the index maintained by the SHA.

[8] Hess acknowledged at oral argument that it had drafted the Asphalt Index Provision.

26

manifested an intention to adjust the Subcontract Price based on fluctuations in the asphalt index maintained by the SHA.  *Cochran*, 398 Md. at 17.

However, the Asphalt Index Provision does not specify whether the SHA formula (which includes, for example, a 5% fluctuation calculation), Hess's formula, or some other formula should be used to calculate such adjustments.  Thus, the issue before the circuit court was not *whether* the parties agreed to adjust the Subcontract Price based on fluctuations in the asphalt index, but rather, *how* the parties were to calculate any such adjustments.

The problem, as the circuit court identified, is that the Asphalt Index Provision does not explain the method of calculating "Pricing [] based on the asphalt index of 562.50." Hess insists that it is "straightforward and clearly understood from the plain language of the provision" that the adjustment calculation "is a simple multiplication calculation based on the new price index at the time of placement for the volume placed."  It points to the spreadsheet attached to Change Order No. 00002, reproduced *infra* as Appendix A, as evidence of this calculation in action.  But the Asphalt Index Provision does not specify a "multiplication calculation," much less one based on "the volume placed."

By contrast, F.O. Day claims that the Asphalt Index Provision assumes application of the formula published by the SHA,[9] which Michael Day, F.O. Day's Vice President,

---

[9] We take judicial notice of the fact that the SHA asphalt index is available on the website of the Maryland Asphalt Association.  *See Asphalt Index*, Maryland Asphalt Association (Jan. 23, 2025, 7:22 PM), https://mdasphalt.org/asphalt-index/.  Immediately below the index are links to "SHA-approved spreadsheets" employing the SHA formula for calculating liquid asphalt, "density, mix, and fuel adjustments" which are updated monthly.  *Id.*

testified is "standard . . . for all public works jobs" in the construction industry.  If the SHA formula is indeed standard in the construction industry, then it is also a sensible method of calculating adjustments.  But again, the plain language of the Asphalt Index Provision does not make any explicit reference to that formula.

Before we look to extrinsic evidence for answers, we examine the Subcontract "as a whole, interpreting 'separate provisions harmoniously[.]'" *Lithko Contracting, LLC*, 487 Md. at 403 (quoting *Johnson*, 466 Md. at 396).  The SAR scope of work states that all of F.O. Day's work was to be performed according to section 321216 of the Project "Bid Set" of technical specifications.  Section 321216 states in the "REFERENCES" section that the SHA Specs' standard "Measurement and Payment Clauses do not apply."  Hess argued in a letter to F.O. Day that this meant Section 540.04.01 of the SHA Specs, which contains the SHA Asphalt Index formula, "does not apply" because the heading for that section is "Measurement and Payment."  However, at trial, Michael Day testified that he understood that language to mean the "Measurement and Payment Clauses" of the SHA Specs "do not apply as they relate to payment on [the Prime Contract]."[10]  Indeed, in the same letter in which it rejected the use of the SHA formula, Hess acknowledged that section 321216 comes from the Prime Contract.  Accordingly, we may assume that the provision referencing section 321216 via the Prime Contract was already in the Subcontract before

---

[10] The full Prime Contract is not contained in the record, but Hess's Dave Gauthier testified at trial that it did not contain an asphalt adjustment provision.  Thus, it is possible that the "Measurement and Payment Clauses" of the SHA Specs were carved out because Section 504.04 provides that "Hot Mix Asphalt Pavement will be measured and paid for at the Contract unit price per ton" – which would be inconsistent with a contract that purportedly does not require Montgomery County to pay Hess for the cost of asphalt.

the Asphalt Index Provision was added. Again, either party's reading would be consistent with the plain language of the Subcontract and section 321216.

Our examination has not uncovered, nor have the parties directed us to, any other provision in the Subcontract that might illuminate the formula to be used for calculating Subcontract Price adjustments under the Asphalt Index Provision. We hold, therefore, that the Asphalt Index Provision is ambiguous because the phrase "[p]ricing is based on the asphalt index of 562.50 and any increase or decrease will be handled as a change order" is "susceptible of more than one meaning or is of doubtful meaning," given that it does not explicitly provide a method for calculating pricing changes, and no other provision in the Subcontract clarifies what method the parties intended to use. *Cochran*, 398 Md. at 17.

This ambiguity does not compel a declaration that the provision is unenforceable for lack of definiteness. Maryland courts have long refrained from declaring a contract provision unenforceable "merely because the parties do not supply every conceivable detail or anticipate every contingency that may arise." *Rocklin v. Eanet*, 200 Md. 351, 357 (1952); *see also Cnty. Comm'rs for Carroll Cnty. v. Forty West Builders, Inc.*, 178 Md. App. 328, 381 (2008). The law "leans against" declaring entire provisions of contracts unenforceable, *Quillen*, 216 Md. at 407, and courts should not do so "unless no other course can be sensibly and reasonably followed." *Cochran*, 398 Md. at 17 (quoting *Sagner v. Glenangus Farms*, 234 Md. 156, 167 (1964)). This principle is particularly important in the construction context, where contracts are often comprised of a series of complex, interlocking documents, layered on top of each other like the concrete blocks in a building's foundation. Subcontracts routinely incorporate by reference a series of subcontract

29

documents along with the prime contract and government specifications. Declaring one provision of a subcontract unenforceable can easily create a ripple effect across other contract documents.

While courts "may not cure indefinite or vague contract language by supplying missing contract terms or definitions," *8621 Ltd. P'Ship v. LDG, Inc.*, 169 Md. App. 214, 227 (2006), they can examine extrinsic evidence of the "negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties" before declaring the provision unenforceable. *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 352 (1974). Here, the circuit court prematurely declared the Asphalt Index Provision unenforceable without fully considering extrinsic evidence.

An unreported opinion from the United States District Court for the District of South Dakota cited by Hess—*Metz Farms v. Fisher Sand & Gravel Co.*, No. CIV 05-4058, 2006 WL 1047067 (D.S.D 2006)—illustrates, under similar facts, the distinction between ambiguous and fatally indefinite contract language. Hess cites *Metz Farms* in support of its argument that the Asphalt Index Provision is clear and unambiguous. We conclude, however, that the district court's decision in *Metz Farms* clarifies when extrinsic evidence, such as "the custom or usage in the trade" of a contract term, can be used to understand the meaning of an otherwise ambiguous provision. *Id.* at *6.

In *Metz Farms*, a South Dakota partnership that owned property containing a quarry ("Metz") and a North Dakota mining corporation ("Fisher") entered into a contract. *Id.* at *1. Under the contract, Fisher paid Metz an annual royalty in exchange for the right to

30

"mine and excavate rock, sand and gravel" from a quarry owned by Metz. *Id.* As in this case, the contract also contained a provision that called for price adjustments based on an index. *See id.* Fisher was obligated to pay Metz 30 cents per ton of mined product, subject to an "escalation clause" that provided that "[t]he price per ton for material will be adjusted per the consumer's price index at the end of each 5 years" that the contract is in effect. *Id.* The contract was contained in "a single page on a form furnished by Fisher." *Id.*

Fisher mined the quarry from 1987 "at least until November 2003," when Fisher notified Metz that it intended to terminate its mining operations. *Id.* The parties then "discovered the escalation clause had been overlooked," and Metz sued Fisher for money it alleged was owed under the clause. *Id.* Fisher answered by asserting several defenses, including an argument that the escalation clause was "indefinite" and therefore unenforceable. *Id.* The parties filed cross-motions for summary judgment on the issue of Fisher's liability under the clause. *Id.*

The district court determined that the plain language of the clause "clearly manifested the intention of the parties to adjust the price per ton according to a calculation tied to the consumer price index." *Id.* at *3. However, the court also found that the clause did not clearly state which "consumer price index" the parties were referring to, meaning it was not clear what "calculation" the parties had agreed to use for price adjustments. *Id.* But rather than declare the provision unenforceable, the court reasoned that there was merely an ambiguity as to the meaning of the phrase "consumer price index." *Id.* at *4. The court concluded that "the ambiguity [wa]s not so indefinite as to render it impossible to fulfill the parties' clear intention about adjusting the per ton price by using the consumer

31

price index" by consulting "parol or extrinsic evidence." *Id.* at *3, *4. It granted partial summary judgment in favor of Metz on the issue of the clause's enforceability, and provided that on the issue of damages, both parties would be permitted to introduce "parol or extrinsic evidence to establish the parties' intention, or to establish the custom or usage in the trade when the term 'consumer price index' [is] used." *Id.* at *6.

Here, as in *Metz Farms*, the language of the Asphalt Index Provision is not so indefinite that parol evidence could not clarify the method of adjustment calculation called for. At trial, each party offered a method of calculating price adjustments that the court could have "sensibly and reasonably" read into the language of the Asphalt Index Provision. *Cochran*, 398 Md. at 17 (quoting *Sagner v. Glenangus Farms*, 234 Md. 156, 167 (1964)). Instead of simply declaring the Asphalt Index Provision unenforceable, the circuit court should have examined parol evidence to determine which of the two methods expressed "the intentions of the parties at the time of the execution of the contract." [11] *Sy-*

---

[11] We note that the circuit court did not mention the principle, well-recognized in contract law, that "language in a contract prepared and concluded by one party is to be construed against that party if there is any ambiguity or uncertainty" in it. *Canaras*, 272 Md. at 352; *see also John L. Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327 (2010) ("It is a basic principle of contract law that, in construing the language of a contract, ambiguities are to be resolved against the draftsman of the instrument." (quoting *Burroughs Corp. v. Chesapeake Petroleum & Supply Co., Inc.*, 282 Md. 406, 411 (1978))). Nor does it appear the court considered all of the testimony about the "circumstances surrounding execution of the contract" and "negotiations of the parties" presented at trial. *Canaras*, 272 Md. at 352. Although the circuit court mentioned Michael Day's testimony that the SHA formula is "standard for all public works jobs," it is unclear whether the court considered whether this, or any other evidence, could demonstrate a trade custom in the asphalt paving industry to default to the SHA formula in calculating price adjustments based on the SHA asphalt index. *See Della Ratta, Inc. v. Am. Better Cmty Devs., Inc.*, 38 Md. App. 119, 130 (1977) ("The court may also consider the special

32

*Lene of Wash., Inc. v. Starwood Urb. Retail II, LLC*, 376 Md. 157, 167-68 (2003) (quoting

*Cnty. Comm'rs of Charles Cnty. v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 445

(2001)).  We therefore vacate the circuit court's ruling with respect to the enforceability of

the Asphalt Index Provision, and remand with instructions to "consider extrinsic or parol

evidence to ascertain the parties' intentions" as to calculating adjustments under the

provision.  *W.F. Gebhardt & Co., Inc. v. Am. Eur. Ins. Co.*, 250 Md. App. 652, 666

(2021).[12]

## II.

## Statute of Limitations on PCO Claims

## Parties' Contentions

Hess argues that F.O. Day's claims concerning PCO 11 and PCO 34 were barred by

Maryland Code (1973, 2020 Repl. Vol.), Courts & Judicial Proceedings Article ("CJP"),

§ 5-101, which states in relevant part that a "civil action at law shall be filed within three

years from the date it accrues[.]"  According to Hess, F.O. Day submitted PCO 11 on

September 12, 2016, and any cause of action on PCO 11 accrued "no later than September

12, 2016" because by that point, "F.O. Day knew it had a claim for payment for additional

---

meaning which trade custom or usage attaches to certain words or terms.").  If language like "[p]ricing is based on the asphalt index" is generally understood in the construction industry to call for use of the SHA formula, that would favor F.O. Day's interpretation of the Asphalt Index Provision because courts have long imputed "knowledge of a trade usage" to "persons in the same trade." *Wathen v. Pearce*, 175 Md. 651, 663-64 (1939).

[12] We briefly note that the court should also consider whether the Asphalt Index Provision applies to "tack coat," as asserted by Hess in Change Order No. 00016.  Because the circuit court simply declared the Asphalt Index Provision unenforceable, it did not reach this issue in its July 5, 2023 opinion.

compensation." Because F.O. Day filed the complaint on January 17, 2020, Hess contends, the suit was filed "more than three years" after F.O. Day's claims relating to PCO 11 accrued.

Hess posits that the accrual date for F.O. Day's claim concerning PCO 11 is the date of PCO 11's submission. Conversely, Hess asserts that F.O. Day's claims concerning PCO 34 accrued not when PCO 34 was submitted, but "when F.O. Day completed the claimed extra work on October 16, 2016." In Hess's view, F.O. Day "had reason to know of its claim for payment" by October 16, 2016 because the "work was completed and the full cost known" at that point. Hess argues that F.O. Day was "sitting on or otherwise delaying action with its claim" by waiting to submit PCO 34 until March 6, 2017, and that it "would turn the statute of limitations rule on its head" if we accepted a date later than October 16, 2016 as the accrual date for F.O. Day's claims concerning PCO 34. Hess urges us to reverse as, in its view, affirming the circuit court's determination that F.O. Day's claims concerning PCO 34 were not barred by the statute of limitations would "set the dangerous precedent of allowing any plaintiff with a claim to delay submission of it as a tactic to extend the statute of limitations."

In response, F.O. Day highlights Section 5.5 of the Master Subcontract, which provides that Hess "is entitled to withhold progress payments to F.O. Day for various reasons, none of which entitles F.O. Day to cease performance under the [Subc]ontract." F.O. Day then points to Section 6.1 of the Master Subcontract, requiring F.O. Day to "proceed with the change, addition, or deletion in the Work, notwithstanding any dispute [over a change order], upon [Hess's] direction," and asserts that the "mandatory

34

performance requirement in the event of a payment dispute applies equally to change orders[.]" According to F.O. Day, it could not sue for breach of contract if Hess withheld payment on a change order because "withholding of payment to F.O. Day is not a breach . . . until its performance under the [Subc]ontract [is] complete and Hess refuse[s] to tender payment for the work and services rendered." Therefore, F.O. Day argues, its breach of contract claims relating to PCO 11 and PCO 34 did not accrue until its "final performance on the Project . . . on or about May 15, 2017," when F.O. Day was entitled to receive final payment from Hess, which was less than three years before F.O. Day filed its complaint on January 17, 2020.

F.O. Day rebukes Hess's treatment of the Subcontract as an installment contract whereby the statute of limitations begins to run on each installment as it becomes due. The Subcontract, F.O. Day insists, is "a pay-when-paid [c]ontract that specifically permits Hess to withhold payments without excusing F.O. Day's continued performance." According to F.O. Day, because the Subcontract provides that Hess's withholding of payment is not a breach, mere nonpayment is "insufficient to start the statute of limitations running." If the Subcontract were an installment contract, F.O. Day posits, it would have been "required to repeatedly file separate suits in the middle of the contract performance" which it argues would "run[] afoul of long-standing Maryland precedent in breach of contract actions 'that not more than one suit may be instituted on the same instrument . . . and that rights cannot be enforced piecemeal.'" (Quoting *Iula v. Grampa*, 257 Md. 370, 373 (1970)). Instead, F.O. Day contends, it was only entitled to file suit for breach of contract after Montgomery

35

County paid Hess for its work on the Project, and then Hess refused to pay F.O. Day. (Citing *Patriot Constr., LLC v. VK Elec. Servs., LLC*, 257 Md. App. 245, 266 (2023)).

**Legal Framework**

"As a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time for filing the suit." *Newell v. Richards*, 323 Md. 717, 725 (1991). Under CJP § 5-101, "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Generally, "the question of accrual in § 5-101 is left to judicial determination." *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95 (2000). "This determination may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied." *Id.* (citing *Poffenberger v. Risser*, 290 Md. 631, 634 (1981)).

A cause of action "accrues when the claimant in fact knew or reasonably should have known of the wrong." *Est. of Adams v. Cont'l Ins. Co.*, 233 Md. App. 1, 25 (2017) (quoting *Poffenberger*, 290 Md. at 636). Nevertheless, a cause of action "cannot accrue until all the elements are present, including damages." *Baker, Watts & Co. v. Miles & Stockbridge*, 95 Md. App. 145, 187 (1993) (citing *Goldstein v. Potomac Elec. Power Co.*, 285 Md. 673, 685 (1979)), *superseded on other grounds* by Rule 2-504.

It is commonly accepted that in breach of contract cases, "a cause of action typically accrues at the time of the breach." *Kumar v. Dhanda*, 426 Md. 185, 195 (2012). "[U]nless the contract provides otherwise, a cause of action for extra labor and services accrues when

36

the work is done or services provided." *Mayor and Council of Federalsburg v. Allied Contractors, Inc.*, 275 Md. 151, 157 (1975). Nevertheless, "the nature of the promises made in the contract and the times for performing those promises" ultimately determine when a breach occurs under a particular contract. *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 649 (1999). For example, when a contract "requires some action, such as an accounting, a billing or a hearing" to occur before payments under the contract are to be made, "then the performance of that activity is 'a condition precedent to recovery of such payments,'" and the statute will not begin to run until that condition precedent is met. *Federalsburg*, 275 Md. at 157 (quoting *Laurel Race Course v. Regal Constr.*, 274 Md. 142, 150 (1975)). We applied this principle in the construction context recently, in *Patriot Construction, LLC, v. VK Electrical Services, LLC*, 257 Md. App. 245 (2023). That case involved a subcontract between Patriot—the general contractor under a contract with the Maryland Procurement Office of the National Security Agency (the "MPO")—and VK Electrical Services, LLC ("VKES"), the company that provided electrical work for the project as a subcontractor, which contained a "pay-when-paid" clause suspending Patriot's obligation to pay VKES for work until the MPO paid Patriot for the same work. *Id.* at 253. We reasoned that "[h]ad VKES ignored the pay-when-paid provision" and sued Patriot for payment before the MPO paid them, "Patriot could have – and likely would have – moved to dismiss by virtue of the non-occurrence of the subcontract's condition precedent." *Id.* at 266.

Where a contract provides for payment in installments, and the nonpayment of an installment constitutes a default, a claim for payment accrues separately on each

installment at the time it is due. In *Avery v. Weitz*, 44 Md. App. 152 (1979), we considered when the statute of limitations in CJP § 5-101 began to run on claims for payment arising out of a $12,240 promissory note that was payable in monthly installments of $340. *Id.* at 153. Weitz filed a declaration for confessed judgment in the circuit court on September 27, 1978, seeking to recover monthly payments dating back to September 1, 1974. *Id.* We held that recovery of all monthly installments due before September 27, 1975 was barred by CJP § 5-101, reasoning that the statute of limitations began to run on each individual installment at the time it was due. *Id.* at 155. We further reasoned that the date of accrual of Weitz's claims could not be the final date of maturity of the promissory note as a whole, because such a holding would mean that "a holder of an installment note without an acceleration provision would be required to wait, despite a default, until the entire note matured before any recovery could be had." *Id.* As the guarantor of the promissory note was obligated to pay each monthly installment in the month it became due, the holder of the note had a separate claim for payment on each installment of the note. *See id.*

**Analysis**

A straightforward reading of the Subcontract drives our decision that the breaches F.O. Day alleges did not occur at either of the times proposed by Hess—the date the change order was submitted, for PCO 11, and the date on which the work was performed, for PCO 34. As "the party raising a statute of limitations defense," Hess had the burden of demonstrating that F.O. Day's claims accrued more than three years before January 17, 2020, when F.O. Day brought this action. *Newell*, 323 Md. at 725. We hold that Hess failed to demonstrate that F.O. Day "reasonably should have known" it had breach of

38

contract claims arising out of PCOs 11 and 34 on any date prior to final performance on or about May 15, 2017. *See Est. of Adams*, 233 Md. App. at 25. We explain.

The Subcontract provided for "progress payments" on a monthly basis, and for payment of the remainder of the Subcontract Price as a final payment after F.O. Day completed work on the Project. Each month, F.O. Day was required to invoice Hess in writing for its "completed work-in-place," along with any "approved change orders." Hess would then make "monthly progress payments," after comparing the invoiced amount to its own accounting, "within seven (7) days of [Montgomery County's] payment to [Hess] for [F.O. Day's] Work." However, under Section 5.5 of the Master Subcontract, Hess had discretion to withhold these "progress payments" for several enumerated reasons, including breach of the Subcontract by F.O. Day or unsatisfactory work product. Furthermore, "in the event of a payment dispute," F.O. Day was required to "proceed diligently with the performance of the Work," but was "entitled to reserve its right to make a claim."

The work and costs for which F.O. Day sought compensation in PCO 11 and PCO 34 did not stem from "completed work-in-place," but rather from undertaking additional survey, layout, and repair work at the site. Hess never approved (or rejected prior to date of completion) PCO 11 or PCO 34. Given that "only approved change orders issued by Hess" could be included in F.O. Day's monthly invoices, F.O. Day was never entitled to include the amounts requested in PCO 11 and PCO 34 in an invoice. Nevertheless, PCO 11 and PCO 34 clearly gave rise to "payment dispute[s]" between the parties, so F.O. Day was entitled to "reserve its right to make a claim" for the compensation it believed it was

39

owed. But that does not mean F.O. Day could actually *bring* a claim on the dates Hess argues the claims accrued.

We fail to see how *Avery* supports a determination, as Hess suggests, that the statute of limitations on F.O. Day's claims relating to PCO 11 accrued no later than September 12, 2016 – the date F.O. Day submitted PCO 11 to Hess. The Subcontract does not contain installment provisions similar to those at issue in the *Avery* case. Under the promissory note in *Avery*, the guarantor was obligated to pay the note holder $340 each month. *Id.* Any failure by the guarantor to make a monthly installment payment when due constituted a default. *Id.* By contrast, Section 5.5 of the Master Subcontract specifies that Hess would "not be in Default" if it had "reasonably" withheld monthly progress payments from F.O. Day for various reasons. Moreover, under the Subcontract, Hess had no obligation to even *consider* including a PCO in a progress payment until that PCO had been "accepted." Monthly progress payments were not fixed installments of the Subcontract Price, as in *Avery*, but rather estimates, based on comparison of F.O. Day's invoices with Hess's own accounting, of the value of F.O. Day's "completed work-in-place" within a given month.

PCO 11 was not accepted or rejected by Hess on September 12, 2016, when F.O. Day submitted it. Hess failed to demonstrate that F.O. Day "reasonably should have known," before May 15, 2017, that Hess had determined to never make payment on all or a portion of PCO 11, or that Hess otherwise breached the Subcontract in regard to PCO 11 on or before that date. *Est. of Adams*, 233 Md. App. at 25 (quoting *Poffenberger*, 290 Md. at 636). Accordingly, Hess failed to show that F.O. Day's claims relating to PCO 11 "accrued prior to the statutory time for filing the suit." *Newell*, 323 Md. at 725.

40

There is even less support for Hess's contention that F.O. Day's claims relating to PCO 34 accrued "when F.O. Day completed the claimed extra work on October 16, 2016"—before PCO 34 was submitted to Hess. In addition to the payment provisions of the Subcontract discussed above, the Subcontract required "some action, such as an accounting, a billing or a hearing" before payment could be made. *Federalsburg*, 275 Md. at 157. Specifically, the Master Subcontract, Section 6.1, requires F.O. Day submit a request for additional payment in the form of a proposed change order. *Id.* This did not occur until March 6, 2017, which would already put F.O. Day's claims relating to PCO 34 within CJP § 5-101's three-year statute of limitations.

Hess's argument that F.O. Day *should* have submitted PCO 34 on October 16, when it had "reason to know of its claim[,]" is not logical under the terms of the Subcontract and the facts presented. F.O. Day did not have "reason to know" it had a claim on October 16, because it had not yet sent PCO 34 to Hess for consideration. If F.O. Day had sued Hess for breach of contract in October 2016, before submitting PCO 34, Hess surely could have defended on the grounds that "an accounting, a billing or a hearing" necessary for payment had not yet occurred. *Federalsburg*, 275 Md. at 157. Furthermore, given Hess's discretion under the Master Subcontract to withhold progress payments, reject or accept proposed changes, and retroactively revoke its acceptance of F.O. Day's work, it was not unreasonable for F.O. Day to assume that it would not get paid the amounts requested in PCO 34 until after F.O. Day completed all of its work under the Subcontract. *Cf. Patriot Constr., LLC*, 257 Md. App. at 266. Therefore, we conclude that Hess also failed to meet

41

its burden of proving that F.O. Day's claims relating to PCO 34 were not made within CJP §5-101's three-year statute of limitations.

The correct accrual date for claims relating to each PCO is the first date on which F.O. Day "reasonably should have known" that Hess had determined not to pay F.O. Day for all or part of the work requested in that PCO. *Est. of Adams*, 233 Md. App. at 25 (quoting *Poffenberger*, 290 Md. at 636); *see also Patriot Constr., LLC*, 257 Md. App. at 265-66. In the instant case, Hess failed to demonstrate that F.O. Day's claims accrued prior to May 2017. Accordingly, we hold that F.O. Day's breach of contract claims relating to PCO 11 and PCO 34 are not barred by the applicable statute of limitations, CJP § 5-101.

## III.

### Merits of PCO 34 Claim

### Parties' Contentions

Hess also challenges the merits of F.O. Day's claims under PCO 34. First, Hess avers that they are partially foreclosed by Section 2.2 of the Master Subcontract, which, according to Hess, "plainly states that means and methods of F.O. Day are part and parcel of its base scope of work obligations under the [Subc]ontract." Hess points specifically to the portion of PCO 34 requesting payment for "numerous changes to the GPS Model" that F.O. Day used in surveying the Project site. In Hess's view, the GPS model was part of F.O. Day's "means and methods of performing its asphalt paving work" and therefore, "F.O Day has [] been paid for this GPS model work within the [Subc]ontract price." Hess insists that F.O. Day "unequivocally admitted" at trial that the GPS model was part of its

means and methods and acknowledged that Hess "did not direct F.O. Day to use" the GPS model in its work on the Project.

Next, Hess asserts that the remainder of F.O. Day's claims under PCO 34 are foreclosed by Section 2.10 of the Master Subcontract, which defines F.O. Day's scope of work under the Subcontract as including "checking grades, elevations and the work performed by others." Therefore, F.O. Day's remaining claims under PCO 34 for "multiple grade checks" and "performing as-built of works by others," are not for "extra work activities . . . but rather part of what [F.O. Day] bargained for and agreed to perform under the [Subc]ontract."

F.O. Day counters by asserting that the Subcontract required Hess to provide "survey, stakeout, and layout" work before F.O. Day commenced paving, and that Hess's failure to provide this work "made it impossible for F.O. Day to complete its work" under the Subcontract "on several occasions." Additionally, F.O. Day contends that it is "not seeking compensation for using GPS on the Project," but rather for the cost of using GPS to complete "additional work" not contemplated by the Subcontract. According to F.O. Day, under Section 2.2 of the Master Subcontract, it was entitled to compensation for "work outside the scope of the [Subc]ontract . . . regardless of the means and methods used."

Similarly, F.O. Day argues, although Section 2.10 of the Master Subcontract requires it to "confirm the conditions necessary to receive performance of the work before beginning performance," it does not require it to "repeatedly ensure that all predicate work is performed in accordance with the [Subc]ontract specifications." Though F.O. Day

43

acknowledges that a certain amount of grade checking and checking of predicate work was contemplated by the Subcontract, it contends that the amount contemplated was "substantially less than what F.O. Day was required to perform on the Project as a result of Hess's multiple failures to ensure the site was available for paving before directing F.O. Day to proceed." F.O. Day argues that even after it gave Hess "notice of discrepancies" between the specifications of the Subcontract and the quality of predicate work, Hess "repeatedly directed F.O. Day to proceed" rather than first ensuring that the site was in "appropriate" condition for F.O. Day to perform its work.

### Analysis

We reiterate that "Maryland courts subscribe to the objective theory of contract interpretation." *W.F. Gebhardt & Co., Inc. v. Am. Eur. Ins. Co.*, 250 Md. App. 652, 666 (2021). Where the terms of a contract are "clear and unambiguous," it is "improper for the court to rewrite [the] contract . . . simply to avoid hardships." *Canaras v. Lift Truck Servs., Inc.*, 272 Md. 337, 350 (1974).

The Master Subcontract includes the following provisions with respect to the scope of the work F.O. Day was obligated to complete as a subcontractor for Hess:

> 2.2 <u>Supervision; Means and Methods</u>. [F.O. Day] shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Subcontract Documents,13 so long as [F.O. Day] does not interfere, delay or otherwise impact the progress of the work on the Project.

---

[13] The MSA defines "Subcontract Documents" as the Subcontract together with "the drawings, specifications, exhibits, and other documents" attached to the MSA or referenced therein.

2.10 <u>Work by Others; Discrepancies</u>.  [F.O. Day] shall check all work performed by others necessary to receive and/or for the performance of [F.O. Day's] Work.  Failure to give notice of any known discrepancy shall relieve [Hess] of any responsibility therefore.  [F.O. Day] shall be responsible for all field measurements and shall check elevations and grades to ensure proper fitting of its Work.

Applying the plain language of Section 2.2 and Section 2.10 of the Master Subcontract, we conclude that the court correctly found that the work for which F.O. Day sought additional payment in PCO 34 fell outside of its scope of work under the Subcontract.  It is clear that both parties recognized that F.O. Day had an obligation to "check all work performed by others" to ensure that the Project site was ready for paving before it began work.  Furthermore, there is no dispute that F.O. Day unilaterally decided to use a GPS model to make its own work more efficient as part of its "means, methods, techniques, sequences and procedures."  The evidence presented at trial demonstrated, however, that Hess repeatedly failed to provide a Project site that was ready to be paved, resulting in costs to F.O. Day not anticipated as part of these contractual obligations.

Under the Master Subcontract, F.O. Day was required to "perform the Work in accordance with the schedule, sequence and direction from [Hess]."  When Hess told F.O. Day that the Project site was ready, F.O. Day was required to head to the site and begin performing.  On multiple occasions, Hess directed F.O. Day to proceed to the site despite glaring problems with precedent work that was not F.O. Day's responsibility.  Each time this happened, F.O. Day expended money and time traveling to the site, checking elevations and grades, performing proof rolls, and examining and recalibrating its GPS

model.  F.O. Day's Kip Gwinn and Thomas Gerhold testified extensively about the costs incurred as a result.  A "reasonable person in the position of the parties," *W.F. Gebhardt & Co., Inc.*, 250 Md. App. at 666, would not have understood the Master Subcontract's language to require F.O. Day to bear these costs itself.  Nor would a reasonable person expect F.O. Day to bear the costs of reworking Hess's inadequate stakeouts so that it could complete the paving work according to "the schedule, sequence and direction" given by Hess, particularly where that work was outside the SAR scope of work.  The circuit court correctly determined that F.O. Day is entitled to compensation for all of this work, much of which F.O. Day completed at Hess's repeated insistence.  We affirm the court's determination that Hess breached the Subcontract by rejecting PCO 34.

## Conclusion

In sum, the record establishes that the parties agreed to adjust the Subcontract Price in accordance with the SHA asphalt index.  The underlying dispute centers on what method the parties reasonably intended to use to calculate any such adjustments.  In this case, the circuit court erred in failing to consider whether the Asphalt Index Provision is merely ambiguous before declaring it unenforceable.  We hold that the Asphalt Index Provision is ambiguous because it is susceptible to either of the reasonable interpretations advanced by the parties.  Therefore, we vacate the damages award to F.O. Day in the amount of $348,655.39 and remand for further proceedings so that the circuit court may consider whether parol evidence reveals the reasonable intention of the parties at the time they executed the Subcontract.  We leave the court with remedial flexibility to determine whether an additional hearing is necessary to take additional evidence on this narrow issue.

46

We affirm the judgment of the circuit court in all other respects. We hold that CJP § 5-101's three-year statute of limitations does not bar F.O. Day's claims relating to PCO 11 and PCO 34 because Hess has not shown that those claims accrued more than three years before this suit was filed.  We also discern no error in the court's determination that the work for which F.O. Day requested additional compensation in PCO 34 was not within its scope of work under the Subcontract, and that Hess was therefore obligated to reimburse F.O. Day for its costs in completing the work.

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; EACH PARTY TO PAY THEIR OWN COSTS.**

# APPENDIX A

| PSTA Liquid Asphalt Index Credit |
|---|

| Date Placed | Mix Design Number Placed | Per Contract Unit Price per Tonnage | MD Asphalt Price Index @ time of Placement | Tonnage Placed | % of Liquid Asphalt per Mix Design | Per Contract Cost of Tonnage Placed | Actual Cost of Tonnage Placed | CREDIT BACK TO HESS |
|---|---|---|---|---|---|---|---|---|
| 4/6/2016 | H128B25R2B53 | $562.50 | $331.25 | 2301.35 | 4.7% | $ 60,841.94 | $ 35,829.14 | $ 25,012.80 |
| 4/14/2016 | H128B25R2B53 | $562.50 | $331.25 | 1466.89 | 4.7% | $ 38,780.90 | $ 22,837.64 | $ 15,943.26 |
| 4/15/2016 | H128B12R2B52 | $562.50 | $331.25 | 1300.90 | 4.7% | $ 34,392.54 | $ 20,253.39 | $ 14,139.16 |
| 4/21/2016 | H128B25R2B53 | $562.50 | $331.25 | 2997.79 | 4.7% | $ 79,254.07 | $ 46,671.84 | $ 32,582.23 |
| 4/22/2016 | H128B12R2B52 | $562.50 | $331.25 | 272.95 | 4.7% | $ 7,216.12 | $ 4,249.49 | $ 2,966.63 |
| 4/25/2016 | H128B12R2B52 | $562.50 | $331.25 | 1412.00 | 4.7% | $ 37,329.75 | $ 21,983.08 | $ 15,346.68 |
| 6/1/2016 | H128B25R2B53 | $562.50 | $332.50 | 1035.12 | 4.7% | $ 27,365.99 | $ 16,176.34 | $ 11,189.65 |
| 6/2/2016 | H128B25R2B53 | $562.50 | $332.50 | 1198.01 | 4.7% | $ 31,672.39 | $ 18,721.90 | $ 12,950.49 |
| 6/3/2016 | H128B25R2B53 | $562.50 | $332.50 | 916.29 | 4.7% | $ 24,224.42 | $ 14,319.32 | $ 9,905.09 |
| 6/7/2016 | H128B12R2B52 | $562.50 | $332.50 | 159.47 | 4.7% | $ 4,215.99 | $ 2,492.12 | $ 1,723.87 |
| 6/7/2016 | H128B25R2B53 | $562.50 | $332.50 | 341.26 | 4.7% | $ 9,022.06 | $ 5,333.04 | $ 3,689.02 |
| 6/8/2016 | H128B12R2B52 | $562.50 | $332.50 | 572.29 | 4.7% | $ 15,129.92 | $ 8,943.46 | $ 6,186.45 |
| 6/13/2016 | H128B25R2B53 | $562.50 | $332.50 | 1226.84 | 4.7% | $ 32,434.58 | $ 19,172.44 | $ 13,262.14 |
| 6/14/2016 | H128B25R2B53 | $562.50 | $332.50 | 1080.87 | 4.7% | $ 28,575.50 | $ 16,891.30 | $ 11,684.20 |
| 6/15/2016 | H128B25R2B53 | $562.50 | $332.50 | 250.35 | 4.7% | $ 6,618.63 | $ 3,912.34 | $ 2,706.28 |
| 6/15/2016 | H128B12R2B52 | $562.50 | $332.50 | 616.89 | 4.7% | $ 16,309.03 | $ 9,640.45 | $ 6,668.58 |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | $ - | $ - | $ - |
| | | | | | | | TOTAL | $ 185,956.53 |

48